# IN THE SUPREME COURT OF IOWA

No. 07–1324

Filed June 11, 2010

**ROYAL INDEMNITY COMPANY,** as
successor in interest to Globe Indemnity
Company, a member of Royal & SunAlliance
USA, Inc.; and **FEDERAL INSURANCE COMPANY,**
a member of the Chubb Group of Insurance Companies,
as good faith subrogees of DEERE & COMPANY,
a Delaware corporation,

      Appellees,

vs.

**FACTORY MUTUAL INSURANCE COMPANY**
a/k/a FM GLOBAL a/k/a FACTORY MUTUAL
ENGINEERING, a Rhode Island limited
liability company,

      Appellant.

---

Appeal from the Iowa District Court for Scott County, Mark D. Cleve, Judge.

Defendant insurance company appeals from a district court judgment awarding the plaintiffs $39.5 million in damages. Defendant contends there was insufficient evidence that it breached any contract with the plaintiffs' insured, and, alternatively, that the damages were not within the contemplation of the parties, and the plaintiffs' claim is barred under Iowa Code section 517.5 (2001). The plaintiffs cross-appeal the district court's reduction of the jury's $39.5 million damage award by a *pro tanto* credit for amounts received in pretrial settlements with other defendants, and the court's dismissal of its negligence claim. **DISTRICT COURT JUDGMENT REVERSED IN PART, AFFIRMED IN PART, AND REMANDED WITH DIRECTIONS.**

Mark McCormick and Margaret C. Callahan of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, Robert J. Gilbertson of Greene Espel P.L.L.P., Minneapolis, Minnesota, William H. Stanhope of Robins, Kaplan, Miller & Ciresi L.L.P., Atlanta, Georgia, and William J. Bush of Bush, Motto, Creen, Koury & Halligan, Davenport, for appellant.

David L. Brown and Aaron T. Oliver of Hansen, McClintock & Riley, Des Moines, Jeffrey J. Asperger, Bary L. Gassman, and Peter H. Honigmann of Asperger Associates LLC, Chicago, Illinois, and Robert T. Park of Snyder, Park & Nelson, P.C., Rock Island, Illinois, for appellees.

**BAKER, Justice.**

Factory Mutual Insurance Company (FM) appeals from the district court judgment awarding Royal Indemnity Company and Federal Insurance Company (hereinafter referred to collectively as (Royal)) $39.5 million in damages, contending there was insufficient evidence that it breached any contract with Deere & Company (Deere), and, alternatively, that the damages were not within the contemplation of the parties. FM also asserts the claim is barred under Iowa Code section 517.5 (2001). Royal cross-appeals the district court's reduction of the jury's $39.5 million damage award by a *pro tanto* credit for amounts received in pretrial settlements with other defendants. Royal also appeals the court's dismissal of its negligence claim. Because we find the damages suffered were not in the contemplation of the parties and were outside the scope of liability for any breach of duty, we reverse the judgment and remand the case for dismissal of all claims.

## I. Background Facts and Proceedings.

This appeal arises out of a February 20, 2001, warehouse fire that destroyed property stored there by Deere. FM is a commercial insurance provider, and from the 1950s through 1997, was Deere's sole property insurance provider. In the mid-90s, Deere sought to broaden its insurance coverage. FM was unwilling to provide the expanded coverage Deere sought, so beginning in 1997, Deere purchased its primary insurance coverage from Royal Indemnity Company and the Chubb Group of Insurance Companies. These carriers provided coverage up to $200 million, and FM provided Deere excess coverage above $200 million. In 1998, the amount at which FM's excess coverage attached rose to $400 million.

FM uses engineering evaluations in its underwriting process. Until 1997, the cost of FM's loss prevention engineering services was built into the premium it charged Deere for insurance coverage. Typically, the primary insurance carrier provides loss prevention engineering services for the insured because of its greater exposure, but Deere requested that FM continue to provide loss prevention services even though it was only the excess coverage carrier. FM agreed to do so under a separate payment-for-services contract and fee unrelated to Deere's insurance policy premiums.

For 1997, FM developed a service plan specifying the Deere locations to be inspected and the frequency of those inspections. The loss prevention services FM offered to Deere were the same as those it provided in conjunction with its insurance coverage. From 1997 to 2000, however, Deere severely cut the amount of funds available for loss prevention services. For the year 2000, Deere budgeted $498,000 for FM's loss prevention services. Deere and FM agreed that this fee would provide Deere with 3200 to 3350 hours of loss prevention services, subject to an adjustment if the hours worked went beyond 3350.

FM's service plan for Deere focused on: (1) managing change— evaluate conceptual, planned, or occurring changes; (2) audits of human element programs—record reviews; (3) walk-throughs of high hazard areas; (4) spot checking of sprinkler control valves and water flow alarms; and (5) water testing on a three-year frequency or as needed based on facility changes. FM's servicing plan provided that if it found any deficiencies during a records review, a full inspection of all valves and alarms may be warranted. FM agreed to provide Deere the loss prevention services outlined in the plan through the year 2000.

In 2000, Deere began the process of consolidating its storage facilities from seven Quad Cities warehouses to one centralized facility. Deere ultimately focused on a facility owned by Petersen Properties, LC (Petersen). Mark Dold, Deere's manager of implements and attachments, was in charge of coordinating the evaluation of the facility. As part of the evaluation process, Dold advised FM that Deere required a first-inspection-site-risk evaluation to determine whether the fire protection system was appropriate for Deere's storage needs. FM agreed to do an evaluation and assigned Tim Geiger, an experienced engineer, to perform the evaluation of the proposed facility.

On July 31, 2000, Geiger toured the Petersen facility. After the tour, Geiger was asked by Tim Kelly, the FM Account Engineer, to complete a simple COPE evaluation and email a report with his recommendations for loss expectancies over $1 million. A COPE is a basic outline on the Construction, Occupancy, Protection, and Exposure of the facility being inspected. During trial, Geiger also referred to this as a fire special inspection. According to Geiger, this inspection is not the same as a first-inspection-site-risk evaluation which can take up to five full days. FM generally tests the fire alarm sprinkler systems during a first inspection. Geiger explained that the scope of a special inspection is determined by what the client requests, and he believed Deere asked him to determine sprinkler specifications for the products it intended to store in the facility.

After touring the facility, Geiger prepared and emailed his report to Nancy Yeager, a member of Deere's risk management department, with copies to Dold and Kelly. The report contained the specifics of the sprinkler system currently installed in the facility, as well as recommendations for altering the system to better protect Deere's

product. Geiger did not test the sprinkler system nor look at any of the facility's maintenance records.

Deere made a series of additional inquiries of Geiger concerning what modifications would need to be made to the current sprinkler system to protect Deere's stored products. Geiger answered them all. In addition, FM supervised a pump acceptance test at the facility. On October 2, Geiger sent Dold a "punch list" letter outlining his recommendations to bring the fire system at the facility up to FM safety standards. In this letter, Geiger recommended that the fire alarm system be upgraded, the sprinkler water alarms tested every month, and the high intensity discharge lights relamped. Deere used this list of recommendations in negotiating with Petersen. On October 26, 2000, Deere entered into a lease for a portion of the warehouse and moved its products into the facility in late November 2000 even though the punch list items had not yet been remedied. When Deere moved into the warehouse, the sprinkler system still had not been tested.

FM's contract with Deere to provide loss-prevention services expired on December 31, 2000. On that date, the FM/Deere insurance relationship ended, and Royal became responsible for loss-prevention inspections at all Deere locations.

Early in the morning on February 20, 2001, a fire broke out in the warehouse. The Davenport Fire Department was called, and an engine arrived thirteen minutes after the fire was discovered. The firefighters attached their hoses to the warehouse hydrants but found the water pressure insufficient to put out the fire. The firefighters attempted to put out the fire for several hours, but eventually could no longer control the fire and retreated. The fire burned for several days, and all of Deere's products were destroyed. The Davenport fire chief testified he believed

they could have extinguished the fire if there had been sufficient water pressure.

The Davenport fire marshal conducted a cause and origin investigation of the fire. Deere and FM also hired experts to investigate the cause of the fire. Neither the fire marshal nor any of the experts were able to determine the cause of the fire. At trial, the fire marshal testified that faulty lights were no longer being investigated as a possible cause of the fire and the investigation was now focused on arson. Deere's fire expert identified three possible causes of the fire. These included: (1) arson, (2) electrical failure or malfunction, and (3) an accident or careless human act as cigarette butts were found at the fire's point of origin. The fire marshal and the experts were also unable to determine why the water pressure was insufficient to extinguish the fire on the day of the incident.

Deere brought an action claiming Petersen negligently maintained the warehouse fire alarm and sprinkler systems. Deere included River Cities Management LLC[1] and FM as defendants. Royal paid in excess of $70 million under its policy to Deere for property loss and other expenses associated with the fire and thereby became subrogated to Deere's claim.

Before trial, all of the named defendants, except FM, reached settlement agreements with Royal. A jury trial was held, and the jury returned a verdict for Royal in the amount of $39,509,145.00. FM filed a motion for judgment notwithstanding the verdict. FM also filed a motion to apply the *pro tanto* credit rule.

The court denied FM's motion for judgment notwithstanding the verdict, but granted FM's motion for application of *pro tanto* credit in

---

[1]River City Management LLC is the property management company hired by Petersen to manage and maintain the Quad Cities warehouse.

part. The court ruled FM was entitled to a credit in the amount of $4,522,527.50, thereby reducing Royal's judgment to $34,986,617.50.

FM appealed from all of the court's rulings. Royal cross-appealed.

## II. Preservation of Error.

FM made a motion for a directed verdict at the close of plaintiff's case, alleging Royal did not prove FM's conduct was the cause of Deere's damages and did not prove FM could be held liable for a "general impairment" to the fire protection system. In the body of the motion, FM argued the causation element of Royal's negligence claim had not been proven, but did not argue lack of causation on Royal's breach of contract claim.

The court took the motion under advisement and reserved judgment. At the close of FM's case, FM once again renewed its motion for a directed verdict. This time, however, FM argued lack of causation in relation to both Royal's negligence claim and the contract claim. With respect to the contract claim, Royal asserted FM's motion was untimely unless made at the close of plaintiff's case. The court agreed, denying FM's contract causation motion as untimely, but granting a directed verdict on the negligence claim. The court also stated that in the event the motion was timely, it also denied the motion regarding the contract claim on the merits.

On appeal, an appellate court's review is limited to those grounds raised in the defendant's motion for a directed verdict. *Konicek v. Loomis Bros., Inc.*, 457 N.W.2d 614, 617 (Iowa 1990). Error must be raised with some specificity in a directed verdict motion. *See Ragee v. Archibold Ladder Co.*, 471 N.W.2d 794, 798 (Iowa 1991). A motion for judgment notwithstanding the verdict must stand on grounds raised in the directed verdict motion. *Dutcher v. Lewis*, 221 N.W.2d 755, 760 (Iowa 1974). On

appeal from such judgment, review by an appellate court is limited to those grounds raised in the directed verdict motion. *Meeker v. City of Clinton*, 259 N.W.2d 822, 828 (Iowa 1977).

Neither these commonly recited rules, our rules of civil procedure, nor previous cases provide any definitive guidance on when a motion for a directed verdict must be made. Nothing in the rules requires a motion for directed verdict occur at the close of plaintiff's case. Iowa Rule of Civil Procedure 1.945 provides that "[a]fter a party has rested, the adverse party may move for dismissal because no right to relief has been shown, under the law or facts, without waiving the right to offer evidence thereafter." This rule is permissive rather than mandatory. *Christensen v. Sheldon*, 245 Iowa 674, 687–89, 63 N.W.2d 892, 900–01 (1954). Iowa Rule of Civil Procedure 1.1003(2), on the other hand, provides:

> If the movant was entitled to a directed verdict *at the close of all the evidence*, and moved therefor, and the jury did not return such verdict, the court may then either grant a new trial or enter judgment as though it had directed a verdict for the movant.

(Emphasis added.) This rule contemplates that the motion for a directed verdict is to be made at the close of all evidence.

In *Christensen*, we approved the procedure of not granting motions for directed verdict until the completion of all evidence except in the most obvious cases. *Christensen*, 245 Iowa at 688–89, 63 N.W.2d at 901. We continue to believe this to be the best course of action. Even the weakest cases may gain strength during the defendant's presentation of the case. *Id.* at 688, 63 N.W.2d at 900 (" 'There is . . . a failure of justice, where the evidence for the defense discloses a case against a defendant already prematurely acquitted, that such acquittal ought never to take place until there is the strongest reason to believe that such a consequence

cannot follow.' " (quoting *Castle v. Bullard*, 64 U.S. 172, 185, 16 L. Ed. 424, 428 (1859)).

Because in most cases it will be prudent not to consider a motion for directed verdict until all evidence has been presented, it would be exalting form over substance to require such motions to be made at the close of plaintiff's case and again at the close of all evidence. We therefore hold that a motion for directed verdict need not be made at the close of plaintiff's case in order to preserve error. Accordingly, FM's failure to argue a lack of causation on Royal's contract claim in its motion for a directed verdict made at the completion of Royal's evidence did not operate as a waiver of that argument.

## III.  Contract Claim.

FM claims the trial court erred in ruling there was sufficient evidence for the jury to find FM breached a contract with Deere and such breach was the proximate cause[2] of Deere's fire loss. Royal counters that there was substantial evidence presented at trial that FM breached its contract with Deere and thereby proximately caused Deere's fire loss.

The standard of review for a district court's denial of a motion for judgment notwithstanding the verdict is for correction of errors at law. Iowa R. App. P. 6.907; *Crookham v. Riley*, 584 N.W.2d 258, 265 (Iowa 1998). In reviewing rulings on a motion for judgment notwithstanding the verdict, we simply ask whether a fact question was generated. *Crookham*, 584 N.W.2d at 265. We, like the district court, view the evidence in the light most favorable to the party against whom the motion is intended, the nonmoving party. *Id.*

---

[2]Proximate cause is the term used by FM. Throughout its brief, FM cited to cases based on tort and contract interchangeably. For reasons that we later explain, the theory of damages and the tests are different. *R.E.T. Corp. v. Frank Paxton Co.*, 329 N.W.2d 416, 420 (Iowa 1983).

**A. Identified Breach of Contract Terms and Conditions.** To prevail on a breach of contract claim, Royal was required to prove: (1) the existence of a contract, (2) the terms and conditions of the contract, (3) that [plaintiff] has performed all the terms and conditions required under the contract, (4) the defendant's breach of the contract in some particular way, and (5) that plaintiff has suffered damages as a result of defendant's breach. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). FM concedes that the jury found a contract existed between FM and Deere, but argues that the terms of the contract were never defined, and, at most, the evidence established a limited obligation on FM to perform the specific loss-control inspections requested by Deere.

"For a contract to be valid, the parties must express mutual assent to the terms of the contract." *Schaer v. Webster County*, 644 N.W.2d 327, 338 (Iowa 2002). Mutual assent is present when it is clear from the objective evidence that there has been a meeting of the minds. *Id.* To meet this standard, the contract terms must be sufficiently definite for the court to determine the duty of each party and the conditions of performance. *Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 346 (Iowa 1999). "A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." *Molo Oil*, 578 N.W.2d at 224.

Deere and FM clearly entered into a contract to inspect the Petersen facility. FM sent Geiger to perform a simple COPE evaluation with recommendations for loss expectancies over $1 million at the prospective Deere storage facility. Deere on the other hand asserts that it asked for a first-inspection-site-risk evaluation to determine whether the fire protection system was appropriate to move its product into the

facility. It appears some miscommunication occurred between the time Deere asked FM to inspect the facility and the time the request to perform a simple COPE was received by Geiger. Deere wanted a first inspection, and it got a simple COPE. These are clearly different inspections.

The jury could have found that the parties contracted for either a COPE or a first-inspection-site-risk evaluation.[3] Our analysis, however, would be the same under either determination. Regardless of what miscommunication occurred between Deere and FM, FM believed at a minimum that it was asked to do something Geiger called a "fire special inspection." According to FM's own policies, this should have included making sure the fire protection systems in the facility worked. FM was asked to look at the sprinkler system and determine what changes were needed to protect Deere's product. A working fire protection system was necessary to protect Deere's product, yet FM did not test the sprinkler system nor look at any of the facility's maintenance records. We find that there is substantial evidence of the terms and conditions of the contract and that FM breached those terms and conditions.

**B. Damages.** For Royal to succeed on its breach of contract claim, however, it must prove that the damages resulted from FM's breach and were in the contemplation of the parties. *See Kuehl v. Freeman Bros. Agency, Inc.*, 521 N.W.2d 714, 718 (Iowa 1994).

We must scrutinize the terms of the contract to determine whether the damages were within the contemplation of the parties. The nature

---

[3]According to the jury instructions, the jury was required to determine the terms of the contract. Because this was a general verdict, however, we cannot determine what terms were found to be part of the contract.

and terms of the contract necessarily dictate the damages recoverable. In *Kuehl* we stated:

> Distinct from the general rule for damages based on commitment of a tort, damages based on breach of a contract must have been foreseeable or have been contemplated by the parties when the parties entered into the agreement. Whether the damages were reasonably anticipated by the parties when the contract was formed may be discerned from "the language of the contract in the light of the facts, including the nature and purpose of the contract and circumstances attending its execution." Damages which a reasonable person would expect to follow from breach of a contract are direct and thus should be awarded.

*Id.* (citations omitted) (quoting 22 Am. Jur. 2d *Damages* § 460, at 541 (1988)). We also require that the damages have some nexus with the breach, i.e., the damages recoverable for a breach of contract are limited to losses actually suffered by reason of the breach and must relate to the nature and purpose of the contract. *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 831 (Iowa 1998).

> Similarly, the Restatement (Second) of Contracts provides:
>
> (1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.
>
> (2) Loss may be foreseeable as a probable result of a breach because it follows from the breach
>
> (a) in the ordinary course of events, or
>
> (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

Restatement (Second) of Contracts § 351, at 135 (1981). This section is further amplified in the comments:

> A contracting party is generally expected to take account of those risks that are foreseeable at the time he makes the contract. He is not, however, liable in the event of breach for loss that he did not at the time of contracting have reason to foresee as a probable result of such a breach. The mere circumstance that some loss was foreseeable, or even that

some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable.

*Id.* § 351 cmt. *a*, at 135.

In determining what damages may have been in the contemplation of the parties, we may also look at the compensation paid by Deere for this contract. *Id.* § 351 cmt. *f*, at 141 (stating when there "is an extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question[,] [t]he fact that the price is relatively small suggests that it was not intended to cover the risk of such liability"); *see also Sundance Cruises Corp. v. Am. Bureau of Shipping*, 7 F.3d 1077, 1084 (2d Cir. 1993) ("[T]he great disparity between the fee charged ($85,000) by ABS for its services and the damages sought by Sundance ($264,000,000) is strong evidence that such a result was not intended by the parties.").

An exception exists to the general rule, however, where there is a loss "as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." Restatement (Second) of Contracts § 351(2)(b), at 135. "If loss results other than in the ordinary course of events, there can be no recovery for it unless it was foreseeable by the party in breach because of special circumstances that he had reason to know when he made the contract." *Id.* § 351 cmt. *b*, at 137. We adopted this rule from the seminal case, *Hadley v. Baxendale,* 9 Exch. 341, 344 (1854). *Vogan v. Hayes Appraisal Assocs., Inc.,* 588 N.W.2d 420, 425 (Iowa 1999).

Royal's position is not that an adequate inspection would have prevented the fire, nor is its position that an adequate inspection would have revealed the system failure that allowed the fire to continue unabated. Royal's position is that but for FM's breach of the contract, Deere would not have moved into the warehouse and would not have

suffered fire damage. Deere claims it relied upon FM's loss-prevention-inspection services and advice in determining whether to move its product into the Petersen facility. Its position is that if FM had done an adequate inspection, it would have revealed problems that were "deal killers" and Deere would not have moved into the Petersen facility.

It was not in the contemplation of the parties that FM would be called upon to answer for any conceivable fire loss. Royal is not entitled to the damages it seeks simply because a fire broke out in the warehouse and harmed the defendant. As previously noted, the cause of the fire was never determined, nor was it ascertained why there was insufficient water pressure to effectively fight the fire. There was no proof that any deficiency that would have been revealed by an adequate inspection either caused the fire or the lack of water pressure to fight the fire.

Certainly FM may have contemplated damages resulting from an inadequate inspection if that deficiency in fact caused the loss. Thus, had the cause of either the fire or the failure of the fire protection system been identified and tied to the inspection, the requisite nexus between the breach and the loss would have been established, and the damages would have been in contemplation of the parties and therefore foreseeable.

The record shows Deere did not want to spend a large sum for this inspection. In fact, Deere sought to keep the fees down. We can only conclude that the parties could not have intended for such a small fee to cover the risk of such enormous liability. In this case, the inspection cost less than $6000. FM clearly did not contemplate a total guarantee of over $30 million for such a fee.

We further find that Royal cannot show special circumstances. It was not contemplated, nor communicated that Deere was relying solely

on FM's inspection in determining whether to move into the Petersen facility. Deere did not ask FM whether it should move in—Deere asked for an inspection. While the inspection was certainly a component of the decision to move into the Petersen facility, other factors such as cost, size, proximity to the manufacturing facilities, and transportation certainly played a part in Deere's decision. Although FM may have foreseen that its inspection would influence Deere's decision whether or not to lease the Petersen facility, there is no evidence that Deere communicated to FM any special circumstances that would lead FM to believe it would be liable for any and all problems that may have resulted from Deere leasing that facility, whether it be by fire, or tornado, or a meteor crashing into the building. We determine that the verdict must be overturned as the damages awarded were not in the contemplation of the parties when they entered into the agreement, and therefore are not foreseeable as a matter of law.

### IV. Negligence Claim.

The court granted FM's motion for a directed verdict on Royal's negligence claim. Royal alleges the district court erred in holding the evidence was insufficient to establish a jury question on proximate cause in its negligence action.

The trial court's grant of a motion for directed verdict is reviewed for correction of errors at law. *Lawrence v. Grinde*, 534 N.W.2d 414, 418 (Iowa 1995). In reviewing the grant of a motion for a directed verdict, the court must determine whether reasonable minds could differ on the issue presented; if so, the grant was inappropriate. *Id.* We view the facts in a light most favorable to the nonmoving party. *Pierce v. Staley*, 587 N.W.2d 484, 485 (Iowa 1998).

There are two great mysteries in this case that are central to our analysis—what caused the fire and why was there no water pressure to put out the fire. As explained earlier, the evidence provides no answer to either.

Viewing the evidence in a light most favorable to Royal, a jury could find that FM did not test the sprinkler system, did not look at any of the facility's maintenance records, and did not test the alarm system. Although FM recommended that the high intensity discharge lights should be relamped, it did not advise Deere that they were known to fail and rain hot materials on the product stored below.

This case was tried prior to our adoption of the duty analysis under the Restatement (Third) of Torts in *Thompson v. Kaczinski*, 774 N.W.2d 829, 835 (Iowa 2009). The concepts embodied in the Restatement (Third), however, have largely been adopted from various sections of the Restatement (Second). *See* Restatement (Third) of Torts: Liab. Physical Harm § 29 cmt. *a*, at 493 (2005) [hereinafter Restatement (Third)] (stating that there was a limit on the scope of liability for tortious actions under the Restatement (Second), however, components of this limit were expressed in several different sections throughout the Restatement (Second)). For ease of understanding, we refer to the consolidated standard articulated in the Restatement (Third). We also note that the result under a Restatement (Second) analysis would be the same.

Damages awarded in a negligence action may differ from the damages awarded for a breach of contract claim arising from the same set of facts.[4] "We have said that tort damages are not limited by the

---

[4]Royal did not specifically argue, either here or at the trial court level, that any difference exists between its contract or negligence theories, citing to a mixed bag of contract and tort cases. We have previously stated:

reasonable contemplations of the parties. Instead, the amount of direct injury is compensated, whether its extent was contemplated or not." *R.E.T. Corp. v. Frank Paxton Co.,* 329 N.W.2d 416, 420 (Iowa 1983). This is not to say, however, that there are no limitations. "No serious question exists that some limit on the scope of liability for tortious conduct that causes harm is required." Restatement (Third) § 29 cmt. *a,* at 493.[5]

The Restatement (Third) expresses this limitation by providing that "[a]n actor's liability is limited to those harms that result from the risks that made the actor's conduct tortious." *Id.* § 29, at 493. "Central to the limitation on liability of this Section is the idea that an actor should be held liable only for harm that was among the potential harms—the risks—that made the actor's conduct tortious."[6] *Id.* cmt. *d,* at 495–96.

------------------------

> Almost all relationships involving professional services arise from an offer and acceptance that would constitute a simple contract. Nevertheless, a claim that a provider of professional services has failed to meet the standard of care that the law has placed on that party is essentially a negligence cause of action.

*Kemin Indus., Inc. v. KPMG Peat Marwick LLP,* 578 N.W.2d 212, 221 (Iowa 1998). Because we determine that Deere has failed to prove the damages caused by FM's breach of contract were in the contemplation of the parties, we need not decide whether Deere's contract claim is simply a negligence action in disguise.

[5]Under the Restatement (Second) of Torts, this concept was expressed by section 430, which provides:

> In order that a negligent actor shall be liable for another's harm, it is necessary not only that the actor's conduct be negligent toward the other, but also that the negligence of the actor be a legal cause of the other's harm.

Restatement (Second) of Torts § 430, at 426 (1965).

[6]The Restatement (Second) expresses this same concept when it states:

> This is true since the actor's conduct, no matter how obviously dangerous to those nearby, cannot be negligent toward such another unless the actor should have realized that the harmful effects of his conduct might extend so far as to bring such a point within the zone of apprehended danger.

> [W]hen scope of liability arises in a negligence case, the risks that make an actor negligent are limited to foreseeable ones, and the factfinder must determine whether the type of harm that occurred is among those reasonably foreseeable potential harms that made the actor's conduct negligent.

*Id.* cmt. *j*, at 505; *see also Thompson*, 774 N.W.2d at 838. The converse is that "[a]n actor is not liable for harm when the tortious aspect of the actor's conduct was of a type that does not generally increase the risk of that harm." Restatement (Third) § 30, at 542.[7]

Royal must show both factual cause and that the loss was within the scope of liability. It is important that we distinguish between factual cause and scope of liability. The Restatement (Third) cites the following example for determining scope of liability:

> Gordie is driving 35 miles per hour on a city street with a speed limit of 25 miles per hour with Nathan as his passenger. Without warning, a tree crashes on Gordie's car, injuring Nathan. Gordie's speeding is a factual cause of Nathan's harm because, if Gordie had not been traveling at 35 miles per hour, he would not have arrived at the location where the tree fell at the precise time that it fell. Gordie is not liable to Nathan because Gordie's speeding did not increase the risk of the type of harm suffered by Nathan. The speeding merely put Gordie at the place and time at which the tree fell. This is true even if the type of harm suffered by Nathan might be found to be one of the risks arising from speeding in an automobile.

*Id.* § 30 cmt. *a*, Illus. 1, at 542–43. The critical question is whether, if repeated, the risks created by the actor's tortious conduct would make it more likely that the type of harm suffered by the other person would also occur. *Id.* at 543. "If the harm is no more likely to occur than if the

------------------------

Restatement (Second) of Torts § 433 cmt. *b*, at 433.

[7]Under Restatement (Second), this limitation is expressed by the following rule:

> The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.

Restatement (Second) of Torts § 435(2), at 449.

actor desisted from the tortious conduct, the harm is not within the scope of the actor's liability pursuant to this Section." *Id.*; *see also Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 742 (Iowa 2009) (in the context of a fraudulent-representation case we held "that the tortious aspect of the conduct increased the risk of the damages claimed").

This limitation on the scope of liability is important for creating appropriate incentives to deter tortious behavior and to address corrective-justice concerns. Restatement (Third) § 30 cmt. *b*, at 544.

> Limiting liability to instances in which the tortious conduct increased the risk of harm is essential for appropriate incentives in a tort system that retains a factual-cause requirement. . . . From a corrective-justice perspective, a merely serendipitous causal connection between the tortious aspect of the actor's conduct and the other's harm provides little reason for requiring the defendant to correct for that which has been wrongfully taken from the plaintiff.

*Id.*

With these principles in mind, we must examine the facts to determine whether the loss suffered is within the scope of liability, i.e., whether the loss was more likely to occur because of the deficiencies in the inspection or whether the loss was merely a case of the inventory being in the wrong place at the wrong time. *Thompson*, 774 N.W.2d at 838 ("The scope-of-liability issue is fact-intensive as it requires consideration of the risks that made the actor's conduct tortious and a determination of whether the harm at issue is a result of any of those risks.").

Under the Restatement (Third) analysis, to impose liability, something FM did or did not do must have increased the risk to Deere's product. There is no evidence that a proper or competent inspection would have either identified the source of the fire and prevented it, or discovered the problem with the water pressure and corrected it. Deere

does not so claim. Deere asserts that it would not have leased the facility had it known of the problems. Thus, Deere may have established factual causation, i.e., but for the bad inspection, it would not have leased the facility. *See Berte v. Bode*, 692 N.W.2d 368, 372 (Iowa 2005) (giving an explanation of the but-for test).

The question, however, is whether merely moving in increased the risk or created the harm that destroyed Deere's product. It was the fire and the inability to put it out that caused the loss, and there is no evidence connecting the inspection with the two sources of the loss. To use the analysis of the Restatement (Third), the alleged deficiencies of the inspection would not have made this loss more likely to occur than if the inspection had been properly performed. An adequate inspection would not have stopped arson or careless smoking, nor does Royal claim it would have disclosed an electrical failure or malfunction. No expert testified that the lights were in fact the cause of the fire, and the fire marshall confirmed that he was no longer investigating the lights as a possible source of the fire. The loss of water pressure remains a mystery as well. No problem that could have been discovered by a reasonable inspection is thought to have been the cause of the loss. Royal's sole contention is that had Deere been aware of the inadequacy of the inspection, it would not have moved its product into the Petersen warehouse.

We have said that even where an act may be a factual cause, "we are convinced that an act which merely places persons in the position where they sustain injury from an unrelated event is not for that reason a legal cause of the injury." *Hansen v. Anderson, Wilmarth & Van Der Maaten*, 657 N.W.2d 711, 715 (Iowa 2003). In *Movitz v. First National Bank of Chicago*, 148 F.3d 760 (7th Cir. 1998), a case involving a

somewhat analogous claim, an investor purchased an office building in Houston. His real estate advisor failed to appropriately check the structural soundness of the building, determine if its cooling system was adequate for Houston's climate, and overestimated its cash flow. *Movitz,* 148 F.3d at 762. In addition, soon after the investor purchased the building, Houston's real estate market crashed. *Id.* The investor did not seek just the repair costs or the difference in value between what was paid for the building and what it was worth, but advanced the claim that had it been aware of the problems, it would not have purchased the building, thus avoiding the disastrous downturn in the Houston real estate market. *Id.* at 762–63.

The court determined the plaintiff should not be allowed to recover any damages because "[t]he bank had no contractual or other legal duty . . . [to] prevent the Houston real estate market from diving overboard." *Id.* at 763. In making this determination, the court cited the case of *Gorris v. Scott,* 9 L.R. Exch. 125 (1874) as an example of when but-for causation is not enough to establish civil liability for wrongdoing. *Id.* at 762. In that case,

> [t]he plaintiff's sheep were being transported on a ship owned by the defendant. A storm arose and the sheep were swept overboard to a watery death. The defendant had failed to equip the ship with pens for the sheep, as he was required to do in order to prevent the spread of disease among the animals. Had he complied with his duty the sheep would have been saved. And so the violation of the duty was a "but for" cause of their loss. Yet the plaintiff was not allowed to recover any damages. The loss of the sheep was a consequence, but not a foreseeable consequence, of the violation of a legal duty, because the duty was to take precautions against a different kind of loss from the one that materialized.

*Id.* at 762–63 (citing *Gorris v. Scott,* 9 L.R. Exch. 125). The Seventh Circuit ultimately determined that "[t]he legal system [was] busy enough

without shouldering the burden of providing insurance against business risks." *Id.* at 763.

We agree with this analysis. FM was not an insurer against any calamity that might befall Deere's inventory but only for those events whose risk of occurrence was increased by FM's actions. Royal failed to prove that a condition or deficiency overlooked by FM in its inspection increased the risk of the loss that actually occurred. We hold that the loss to Deere's inventory was outside the scope of liability.

## V. *Pro Tanto* Issue and Iowa's Immunity Statute.

FM contends that Iowa's inspection immunity statute, Iowa Code section 517.5, bars Royal's contract and negligence claims. FM also requested that the trial court apply the *pro tanto* credit rule and reduce Royal's verdict by the settlement amounts Royal and Deere received from other named defendants. Because we have determined Royal is not entitled to recover the claimed damages, we need not decide these issues.

## VI. Disposition.

Because we hold that the damages awarded on Royal's contract claim were not in the contemplation of the parties when they entered into the agreement, and were therefore not foreseeable as a matter of law, the verdict must be overturned. In addition, because the faulty inspection did not increase the risk of loss, we hold the loss of Deere's inventory was outside the scope of liability. The judgment is reversed, and the case remanded for dismissal of all claims.

**DISTRICT COURT JUDGMENT REVERSED IN PART, AFFIRMED IN PART, AND REMANDED WITH DIRECTIONS.**