# IN THE COURT OF APPEALS OF IOWA

No. 23-1250
Filed January 9, 2025

**AESTHETIC ELEMENTS, INC.,**
    Plaintiff-Appellee,

**vs.**

**MEERA ENTERPRISE, LLC,**
    Defendant-Appellant.
_____

    Appeal from the Iowa District Court for Linn County, David M. Cox, Judge.


    A defendant appeals a jury verdict awarding liquidated damages to the plaintiff on its breach-of-contract claim. **AFFIRMED.**


    Jodie C. McDougal, Brandon R. Underwood, and Sarah B. Golwitzer of Fredrikson & Byron, P.A., Des Moines, for appellant.

    Ryan J. Coufal and Gretchen L. McGill (Pro Hac Vice) of Dvorak Law Group, LLC, Omaha, Nebraska, for appellee.


    Heard by Greer, P.J., and Schumacher and Badding, JJ.

**BADDING, Judge.**

In the aftermath of the August 2020 derecho that tore through Iowa, Meera Enterprise, LLC hired Aesthetic Elements, Inc. to evaluate its property damage and submit a proposed scope of work to Meera's insurer. The parties dispute whether they also agreed that Aesthetic Elements would perform the approved repairs. When Meera retained a different contractor, Aesthetic Elements sued for breach. A jury found in Aesthetic Elements' favor and awarded the company liquidated damages. Meera appeals, challenging (1) whether there was an enforceable contract; (2) the enforceability of a liquidated damages provision in that contract; (3) the admission of lost-profits testimony from the owner of Aesthetic Elements; and (4) the court's refusal to submit a spoliation instruction to the jury. We affirm.

## I. Background Facts and Proceedings

Meera Enterprise, LLC operates a hotel in Cedar Rapids, Iowa. On August 10, 2020, a powerful windstorm carved a path of destruction through Cedar Rapids and the surrounding area. Among the affected properties was Meera's hotel. Meera promptly opened a claim with its insurer, West Bend Mutual Insurance Company. It then turned to coordinating repairs.

On August 13, Meera's owners—Dheeraj Julka and Rajinder Singh—arranged a meeting with Aesthetic Elements, Inc., a contractor specializing in "insurance restoration" projects. Julka and Aesthetic Elements were working together on a hail damage claim for another hotel owned by one of Julka's other entities. During that meeting, representatives for Meera and Aesthetic Elements executed a one-page, standardized "Service Agreement" prepared by Aesthetic Elements.

Under the service agreement, Meera retained Aesthetic Elements "as general contractor of record for the purpose of inspecting, evaluating and creating an estimate for the scope of work necessary to repair or replace the damage" to Meera's hotel. The service agreement also provided:

> If [Meera's] insurance company (the "Insurer") approves a claim for the Work (the "Claim"), [Meera] acknowledges and agrees that [Meera] shall promptly enter into a Construction Agreement with [Aesthetic Elements] to set forth the terms and conditions upon which [Aesthetic Elements] shall perform the Work. The cost of the Work shall be equal to the amount of the replacement cost value authorized by the Insurer (including all overhead and profit), plus the insurance deductible which shall be paid by [Meera] to [Aesthetic Elements] (the "Agreed Price").

If Meera failed to enter a construction agreement or authorize repairs following approval of the claim, the service agreement required Meera to pay Aesthetic Elements "twenty percent . . . of the replacement cost value of the Claim."

According to Aesthetic Elements, these terms were designed to facilitate an efficient relationship between contractor, customer, and insurer. Project manager Cody Langan testified that preparing an estimate and negotiating the scope of work is "50 percent" of an insurance restoration project. The scope of work, according to Langan, sets out "what needs to be done . . . to put the property back to its pre-loss condition while maintaining current warranties, building code, [and] manufacturer specifications." Langan testified that the structure of the service agreement gave Aesthetic Elements flexibility to negotiate necessary repairs while capping Meera's out-of-pocket costs at the price of its deductible. Julka testified that, based on his review of the service agreement, he understood Meera was hiring Aesthetic Elements to "fix the roof" on its hotel.

Immediately after the parties signed their service agreement, Aesthetic Elements got to work evaluating the damage to the hotel. Workers spent multiple days inspecting the roof membrane and conducting temporary repairs. On September 4, Aesthetic Elements submitted an eighty-three-page inspection report to West Bend comprised of pictures that Langan took the month before. Although Langan began preparing a scope of work around the same time, he did not complete it until October 15.

Meanwhile, Meera was talking to another contractor—North-West Roofing. A lead generator from North-West had contacted Meera after the derecho and arranged a meeting between Meera and one of North-West's project managers. On September 5, North-West started a scope of work for Meera, which it completed five days later. The scope of work was revised later in September as North-West communicated with Meera's claims representative at West Bend. During this same time, Langan was also communicating with the claims representative, emailing him on September 14 "to see where we are at with this claim?" The representative responded, "Cody[,] I know we . . . emailed back and forth before and I know you're a contractor. What company are you with?" Langan answered, "I am with Aesthetic Elements, Inc. [W]e have been contracted by the insured to complete their repairs. I will also re[-]attach a copy of our contract."

On October 6, Meera signed an agreement with North-West to begin repairs on the hotel. Aesthetic Elements was unaware. It proceeded to submit its completed scope of work to a public adjuster identified by Julka the day before the contract with North-West was signed. Langan testified that once a public adjuster is involved, the insurance company and contractor cannot communicate: "all

correspondence from a contractor goes through that public adjuster."  Langan testified that he did not learn about North-West's involvement until sometime in November, when his brother and owner of Aesthetics Elements, Steven Langan, saw people at work on the roof of the hotel.

West Bend ultimately approved a claim for $461,645 in wind damage to Meera's property.  Repairs were completed by North-West.[1]  Meera never signed a construction agreement with Aesthetic Elements, and Aesthetic Elements was never paid.  In November 2021, Aesthetic Elements sued for liquidated damages, alleging Meera violated the terms of the service agreement by "failing to allow Aesthetic Elements to perform any and all work to the [p]roperty as approved and agreed to by West Bend."  Aesthetic Elements also asserted a claim for unjust enrichment.

Meera sought summary judgment, arguing, among other things, that the service agreement was not supported by consideration and was an unenforceable "agreement to agree."  Meera also challenged the liquidated damages provision as an invalid penalty.  The district court denied the motion.  Following a four-day trial, the jury returned special verdicts finding the parties entered a valid contract; Meera breached the contract; and Meera failed to prove its affirmative defenses, including prior material breach.  It awarded Aesthetic Elements $93,329 in liquidated damages, leaving a line for "Anticipated or Actual Damage" blank.  The

---

[1] Julka testified that Meera paid North-West $195,000 to repair the "main roof" at the hotel.  Meera spent some of the remaining insurance money to make other repairs and pay off a loan on the hotel.

jury also awarded damages for unjust enrichment, although the parties agreed that Aesthetic Elements' success on its contract claim precluded recovery in equity.

Meera moved for judgment notwithstanding the verdict, but the district court found substantial evidence supported the jury's findings. This appeal followed.

## II. Standards of Review

Denial of a motion for directed verdict is reviewed for correction of errors at law. *Royal Indem. Co. v. Factory Mut. Ins.*, 786 N.W.2d 839, 846 (Iowa 2010). Exclusion of a requested jury instruction is also reviewed for correction of errors at law, *Lynch v. Saddler*, 656 N.W.2d 104, 107 (Iowa 2003), while evidentiary rulings are reviewed for abuse of discretion. *Konchar v. Pins*, 989 N.W.2d 150, 162 (Iowa 2023).

## III. Analysis

### A. Preservation of Error

Meera frames several of its arguments as appealing the denial of its motion for summary judgment. Aesthetic Elements contends the court lacks jurisdiction to review that interlocutory order. "An order overruling a motion for summary judgment is a nonreviewable order when the district court finds a genuine issue of material fact exists and the case proceeds to final trial." *Estes v. Progressive Classic Ins.*, 809 N.W.2d 111, 114 (Iowa 2012). Yet issues raised in an unsuccessful motion for summary judgment may still be reviewed on appeal if they are renewed in a motion for directed verdict and adjudicated on the trial evidence. *Jones v. Glenwood Golf Corp.*, 956 N.W.2d 138, 143 (Iowa 2021); *accord Halbur v. Larson*, ____ N.W.3d ____, ____, 2024 WL 4996599, at *5 (Iowa 2024).

At the close of Aesthetic Elements' case, Meera moved for a directed verdict, arguing that it was entitled to judgment as a matter of law on several grounds it asserted at summary judgment and presented again on appeal—including that "an agreement to agree [at] some point in the future is not a contract." The district court denied the motion, concluding Aesthetic Elements had offered sufficient evidence for a jury to find "a contract for a certain agreed price" with a "certain scope of work." Meera unsuccessfully renewed its arguments in a motion at the close of all evidence and in a post-trial motion for judgment notwithstanding the verdict. By reviving its summary judgment arguments through motions at trial, Meera preserved them for appellate review on the record made at trial.

### B. Enforceability of the Service Agreement

Meera attacks the enforceability of the service agreement on several fronts, contending that it is an unenforceable "agreement to agree," lacking in mutual assent and consideration.[2] Upon viewing the evidence in the light most favorable to the verdict, we find substantial evidence supports the jury's verdict finding a valid contract between the parties. *See Royal Indem. Co.*, 786 N.W.2d at 845–46.

"For a contract to be valid, the parties must express mutual assent to the terms of the contract." *Id.* at 846 (citation omitted). "Mutual assent is present when it is clear from the objective evidence that there has been a meeting of the minds." *Est. of Cox v. Dunakey & Klatt, P.C.*, 893 N.W.2d 295, 303 (Iowa 2017) (citation omitted). "[W]hen the parties agree to a contract on a basis to be settled in the

---

[2] Meera also argues that the service agreement is unenforceable as a matter of "public policy and common sense." Because Meera presents no authority in support of this argument, we will not consider it on appeal. *See* Iowa R. App. P. 6.903(2)(a)(8)(3).

future," the requirement of mutual assent is not satisfied. *Whalen v. Connelly*, 545 N.W.2d 284, 293 (Iowa 1996) ("[A]n agreement to agree is not a contract.").

A meeting of the minds typically will be found only if the terms of a contract are "sufficiently definite for the court to determine the duty of each party and the conditions of performance." *Royal Indem. Co.,* 786 N.W.2d at 846; *see also* Restatement (Second) of Contracts § 33 (Am. Law. Inst. 1981). Definite terms are "understandable or ascertainable" at the time the contract is entered. *Air Host Cedar Rapids, Inc. v. Cedar Rapids Airport Comm'n*, 464 N.W.2d 450, 453 (Iowa 1990). Iowa courts "are reluctant to hold a contract unenforceable for uncertainty and they bend every effort to avoid such a result." *Palmer v. Albert*, 310 N.W.2d 169, 172 (Iowa 1981).

Meera argues that the service agreement is unenforceable because it required the parties to execute a separate contract upon approval of a claim by Meera's insurer. The plain language of the service agreement undeniably obligated the parties to enter a future "Construction Agreement." But contrary to Meera's position, the analysis does not end there. A binding contract exists "where the parties have agreed upon all essential facts . . . , notwithstanding the fact that a more formal contract is to be prepared and signed later." *McCarter v. Uban*, 166 N.W.2d 910, 914 (Iowa 1969) (citation omitted); *accord Kunz v. Kunz*, No. 15-1711, 2016 WL 7403730, at *4 (Iowa Ct. App. Dec. 21, 2016). Thus, the question before us is not simply whether the parties planned to sign another document at some future date; it is whether substantial evidence supports the jury's determination that

the parties "agreed upon all essential facts" at the time they entered the service agreement.[3] *McCarter*, 166 N.W.2d at 913 (citation omitted).

Aesthetic Elements alleges Meera breached a promise to either retain Aesthetic Elements for the storm repairs or pay a 20% cancellation fee. We must consider whether *that* promise is enforceable under the service agreement. *See Nw. Bank & Tr. Co. v. Pershing Hill Lofts, LLC*, No. 22-1941, 2024 WL 4964594, at *4 (Iowa Ct. App. Dec. 4, 2024) ("[W]hen an unenforceable agreement-to-agree term is part of an otherwise valid contract, other terms in the contract may still be enforced."). Meera contends there was no such enforceable contract because the service agreement fails to define the essential terms of Aesthetic Elements' performance—particularly, the approved scope, price, and schedule for the repair work. According to Meera, these terms were all to be set forth in the construction agreement, which "the parties never so much as discussed." We disagree.

The essential terms of the work Aesthetic Elements promised to perform were "understandable or ascertainable" from the service agreement. *Air Host Cedar Rapids*, 464 N.W.2d at 453. For starters, although the agreement does not specify a total price for Aesthetic Elements' work, it does fix the method by which Aesthetic Elements' compensation would be determined: "the amount of the

---

[3] The jury was instructed:

> An agreement to agree at some point in the future is not a contract. An agreement to agree to enter into a contract is of no effect unless all of the terms and conditions of the contract are agreed on and nothing is left to future negotiations. A writing that clearly contemplates the subsequent signing of a formal agreement suggests that the parties to the writing did not intend to be bound until the subsequent formal agreement is finalized.

replacement cost value authorized by the Insurer (including all overhead and profit), plus the insurance deductible." Nothing about payment was left for further negotiation. Where a contract's terms provide a reasonably certain basis for determining price, the contract is enforceable. *See Arendt v. Vande Noord Const., Inc.*, No. 02-1624, 2003 WL 21459025, at *2 (Iowa Ct. App. June 25, 2003) (finding an oral contract to build a home on a "time and materials" basis was not fatally indefinite with respect to price).

Likewise, the service agreement states that the scope of Aesthetic Elements' performance was for work "necessary to repair or replace the damage to the Property." The agreement expressly defines that scope as "the Work" and makes Aesthetic Elements' performance contingent upon the insurer's approval of "a claim for the Work." In other words, the scope of Aesthetic Elements' work would consist of whatever repairs the insurer approved. That an essential term must be determined by reference to outside facts does not make a contract indefinite. *See Butts v. Iowa Health Sys.*, No. 13-1034, 2015 WL 1046119, at *8 (Iowa Ct. App. March 11, 2015) (finding contract language referencing a hospital's "regular rates and terms" was not indefinite where those rates and terms could be determined from extrinsic documents or facts).

Meera also highlights that the service agreement does not include a schedule for Aesthetic Elements' performance. But that alone is not enough. "When a contract fails to specify time for performance, the parties must perform within a reasonable time." *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 619 (Iowa 1999); *see also Shelby Cnty. Cookers, L.L.C. v. Util. Consultants Int'l, Inc.*, 857 N.W.2d 186, 192 (Iowa 2014); Restatement (Second) of Contracts § 33 cmt. d

(noting "contracts are often made which do not specify the time for performance," and that when "the contract calls for a single performance . . . , the time for performance is a 'reasonable time'").

Meera relies on two out-of-state cases finding construction contracts unenforceable for failure to define essential terms. In *LeMaster Construction, Inc. v. Mahoney*, the Minnesota Court of Appeals found that the terms of an agreement for fire and water remediation services were "never fully settled" where the parties signed a document providing for a scope of work to be "authorized by [the homeowner's] insurance company" and "specifically set forth in attached Exhibit 'A.'" No. A06-1202, 2007 WL 1599192, at *3 (Minn. Ct. App. June 5, 2007). No "Exhibit A" was ever prepared, and the parties were "still discussing" what work would be performed one month later. *Id.*

In *Spokane Structures, Inc. v. Equitable Investment, LLC*, the Idaho Supreme Court found an agreement for a commercial renovation project was unenforceable where the contractor agreed "to design, engineer, and draft plans in preparation of all documents/drawings required to enable the owner and contractor to agree on a final design and cost of construction to be performed." 226 P.3d 1263, 1264 (Idaho 2010). Noting "both parties admitted that the [agreement] was not a binding contract because it was merely an agreement to agree," the court reversed an underlying determination that the contractor's equitable claims were barred. *Id.* at 1268.

Meera's authorities are not persuasive. The question in *Spokane Structures* was not whether definite terms could be ascertained, but whether an undisputedly non-binding agreement undermined a contractor's equitable claims. *Id.* And the

court in *LeMaster Construction* focused on the parties' subsequent negotiations in finding the "gap" created by a missing attachment had never in fact been closed. 2007 WL 1599192, at *3. The Minnesota Court of Appeals later distinguished *LeMaster* on its facts in a decision finding a nearly identical "insurance-proceeds" contract was not fatally indefinite. *See Smart Constr. & Remodeling, Inc. v. Suchy*, No. A22-1524, 2023 WL 5525071, at *4 (Minn. Ct. App. Aug. 28, 2023) (upholding a jury's special verdict finding an enforceable contract where the agreement provided the contractor would perform "all work approved" by the homeowner's insurance company, if the authorized payment was acceptable to the contractor).[4]

In this case, the parties' intent to bind themselves under the service agreement is clear. As another panel of this court recently observed, "a contract need not be lengthy or complex to be valid. We need only to understand 'the duty of each party and the conditions of performance.'" *Nw. Bank & Trust Co.*, 2024 WL 4964594, at *5 (quoting *Royal Indem. Co.*, 786 N.W.2d at 846). We have that understanding here. As the district court succinctly put it, "we have a signed service contract." Julka himself agreed. *See Kunz*, 2016 WL 7403730, at *4 (finding "substantial objective evidence to support the jury's finding of a binding

---

[4] Nor do Meera's authorities appear to reflect a national trend. Cases from other states have deemed similar insurance restoration agreements sufficiently definite to enforce. *See, e.g.*, *Cohen v. P&C Restoration Servs., LLC*, No. 14-22-00907-CV, 2024 WL 1868620, at *3 (Tex. App. Apr. 30, 2024) (finding an insurance restoration contract was not indefinite where "the scope of repairs agreed to by the insurer at the prices agreed to by the insurer form the essential terms of the agreement"); *Helton v. U.S. Restoration & Remodeling, Inc.*, 61 N.E.3d 808, 821 (Ohio Ct. App. 2016) (rejecting a homeowner's argument that an insurance restoration agreement was fatally indefinite for lack of a fixed price, reasoning "the parties agreed to be bound to a price term reflecting the amount agreed on by the insurance company and [the contractor], with the provision that [the contractor] would perform such repairs at no cost to [the homeowner]").

contract" when the party challenging the contract testified "the parties had reached an agreement"). Julka testified that he reviewed the service agreement before it was signed, and he understood that Meera was retaining Aesthetic Elements to "fix the roof" on its hotel. He stated that, "in [his] mind, it was very clear" Meera had an agreement and was "under [a] contract" with Aesthetic Elements. Indeed, Julka testified that he believed Meera needed Aesthetic Elements' permission before hiring a replacement contractor to perform repairs.

"In analyzing issues of mutual assent, we are to look to what the parties did and said, rather than to some secret, undisclosed intention." *Higdon v. Rana*, No. 23-1107, 2024 WL 4370048, at *6 (Iowa Ct. App. Oct. 2, 2024); *accord Schaer v. Webster Cnty.*, 644 N.W.2d 327, 338 (Iowa 2002). Despite Julka's testimony otherwise, Meera contends that no reasonable juror could find the service agreement reflected a meeting of the minds because it expressly references "terms and conditions" of a construction agreement that Meera never saw, much less signed.[5] But, again, the question for the jury was not whether the parties reached a meeting of the minds about what language would be set out in a future document. The question was whether Meera agreed for Aesthetic Elements to perform the repairs to the hotel roof. Substantial evidence indicates that it did. *See Nw. Bank & Trust Co.*, 2024 WL 4964594, at 4–5 (finding an "exclusivity clause" in a financing

---

[5] In response, Aesthetic Elements suggests the terms of the construction agreement were incorporated into the service agreement, pointing to the Langans' testimony that they considered the construction agreement to be a non-negotiable addendum. On that point, we disagree. Nothing in the service agreement calls the construction agreement an "addendum," nor does it expressly incorporate the construction agreement's terms. But because we find substantial evidence for a meeting of the minds under the service agreement alone, it makes no difference that the construction agreement was not incorporated.

proposal was not "an agreement to agree" where the clause prohibited the borrower "from seeking financing from other lenders while the parties are engaged in due diligence").

We also find substantial evidence that the service agreement was supported by consideration. Consideration exists if the promisee "does or promises to do something the promisee has no legal obligation to do" or "refrains, or promises to refrain, from doing something the promisee has a legal right to do." *Margeson v. Artis*, 776 N.W.2d 652, 656 (Iowa 2009). Meera contends that consideration is lacking because the only promise it made to Aesthetic Elements was an unenforceable promise to sign another agreement. The district court rejected this argument in its ruling on Meera's motion for judgment notwithstanding the verdict, finding substantial evidence that Meera promised to pay Aesthetic Elements the claim proceeds and deductible in return for Aesthetic Elements' promise to perform repairs approved by Meera's insurance company. We agree. For the reasons already discussed, substantial evidence supports the jury's verdict that Meera promised to do more than sign a construction agreement.

## C.    Material Breach

Meera briefly argues that any obligation it owed under the service agreement was excused by a prior material breach: Aesthetic Elements' failure to submit a scope of work to Meera's insurer.[6]    A material breach of contract

---

[6] Meera also suggests that Aesthetic Elements breached by failing to present a construction agreement for Meera's signature. But on the plain language of the service agreement, any such duty would not come due until Meera's insurer approved Aesthetic Elements' scope of work. No one disputes that Aesthetic Elements' scope of work was never approved, although North-West's was.

discharges the duties of the non-breaching party, but not automatically. *Dolly Invs., LLC v. MMG Sioux City, LLC*, 984 N.W.2d 168, 177 (Iowa 2023). When the contract is silent on the consequences of breach, a non-breaching party's performance is suspended pending the breaching party's opportunity to cure. *Id.* Only when it is too late to cure will the non-breaching party's obligations be finally discharged. *Id.*; *see also* Restatement (Second) of Contracts § 242 & cmt. a (discussing the circumstances to be considered in determining the time after which a party's uncured breach discharges the other party's remaining duties).

At trial, Cody Langan testified that he began preparing Aesthetic Elements' estimate for repairs to the hotel roof on September 3, 2020. According to Langan, Julka instructed him to send the completed scope of work to Jeff Martin, a public adjuster. Langan testified that he emailed the scope of work to Martin on October 15. A screenshot of the email from Langan to Martin was admitted into evidence over Meera's objection. Langan testified that he could not communicate directly with West Bend so long as a public adjuster was involved with the claim.

Langan also testified that between September 3 and October 15, Julka never asked Aesthetic Elements to speed up its work or stop altogether. Langan said that Aesthetic Elements was unaware Meera had hired a replacement contractor until sometime in November 2020, when his brother Steven saw workers on top of the hotel roof. Julka, on the other hand, testified that he complained to Cody Langan about Aesthetic Elements' pace "almost every day" and that he told Langan in September that Meera would be changing contractors. Undisputedly, North-West was conducting repairs on the roof by November 7.

Suffice it to say, the trial record about the circumstances of Aesthetic Elements' performance is conflicted. Meera offers no reason to disregard Cody Langan's testimony. Crediting Langan's account, a reasonable juror could find that Aesthetic Elements submitted its scope of work to Meera's preferred recipient,[7] that Meera did not voice concerns about the timeliness of Aesthetic Elements' performance, and that Meera authorized North-West to proceed with the repairs without offering Aesthetic Elements an opportunity to cure. *See Van Sickle Const. Co. v. Wachovia Com. Mortg., Inc.*, 783 N.W.2d 684, 687 (Iowa 2010) ("Evidence is substantial if a reasonable mind would find it adequate to support a finding," taking "into consideration all reasonable inferences that could fairly be made by the jury."). We accordingly conclude there was substantial evidence for the jury to conclude that Meera's duties were not discharged.

### D.    Liquidated Damages

Meera claims the district court erred in finding that the service agreement's liquidated-damages provision was enforceable. We review a determination on the enforceability of a liquidated-damages provision for correction of errors at law. *Rohlin Constr. Co. v. City of Hinton*, 476 N.W.2d 78, 79 (Iowa 1991).

"[P]arties may fix damages by contract when the amount of damages is uncertain and the amount fixed is fair." *Id.* However, liquidated-damages provisions that seek to punish for breach, rather than compensate for loss, are

---

[7] Meera denies ever hiring Martin to handle its claim for the hotel roof. But exhibits admitted at trial show that Julka texted Langan with Martin's contact information on October 6, and that, five days earlier, Julka had informed West Bend that Meera intended to hire a public adjuster.

unenforceable on public policy grounds. *Id.* at 80. Two factors guide courts in determining whether liquidated damages are compensatory or penal: (1) whether the amount of damages reasonably approximates "the anticipated or actual loss caused by the breach" and (2) "the difficulty of proof of loss." *Id.* (quoting Restatement (Second) of Contracts § 356 cmt. b).

The service agreement provides that Meera would pay Aesthetic Elements a fee equal to 20% of the insurer-approved replacement costs if Meera declined to proceed with Aesthetic Elements for performance of roof repairs. The district court found this fixed fee was appropriate given the profit margin Aesthetic Elements anticipated for its repair work and the unknown scope of the project at the time the service agreement was signed. On appeal, Meera contends that Aesthetic Elements failed to adequately explain why its standardized service agreement sets liquidated damages at 20%. According to Meera, it "defies reason to suggest 20% of the replacement cost value of every single Construction Agreement Aesthetic Elements enters into approximates the anticipated or actual losses of preparing an estimate on any particular project."

Meera's arguments are unavailing. Whether the service agreement's 20% fee would approximate Aesthetic Elements' losses on other projects is irrelevant to determining the reasonableness of liquidated damages here. *See id.* ("The amount fixed is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches." (citation omitted)). And while Meera asserts that awarding liquidated damages in proportion to ultimate replacement costs creates a "windfall for the contractor who

has maybe just taken some photographs and started to prepare a scope of loss," that position forgets that Aesthetic Elements is entitled to more than the value of its inspection work. "When a contract has been breached the nonbreaching party is generally entitled to damages that will place that party in as good a position as he or she would have occupied had the contract been performed." *UE Loc. 893/IUP v. State*, 997 N.W.2d 1, 11 (Iowa 2023) (cleaned up). Liquidated damages under the service agreement must be measured against the entire benefit of the bargain Aesthetic Elements stood to receive, including the profits from its anticipated repair work.

Steve Langan testified that Aesthetic Elements typically bakes in a 20% profit margin when preparing estimates on insurance restoration projects. His brother concurred that 20% is the industry standard. That said, the evidence showed that Aesthetic Elements would have seen an even better margin on the Meera project. Accounting for Aesthetic Elements' expected costs, Steve Langan estimated profits of $179,945—a roughly 40% return on the claim approved by West Bend and nearly double the liquidated damages amount of $93,329.14. In other words, Aesthetic Elements' liquidated damages were not "unreasonably large" in comparison to its expected profits. *Rohlin*, 476 N.W.2d at 81. And although Meera disputes the reliability of Langan's calculations, the district court credited his testimony. This court does not second-guess credibility determinations on appeal. *See Tim O'Neill Chevrolet, Inc. v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1996) ("[O]ur task is to determine whether substantial evidence supports the district court's findings according to those witnesses whom the court

believed."). For these reasons, we conclude substantial evidence supports the court's determination that the liquidated damages provision is enforceable.

### E. Lost-profits Testimony

Meera next claims the district court abused its discretion in allowing Steve Langan to testify about Aesthetic Elements' lost profits. It contends this evidence should have been excluded because Aesthetic Elements failed to disclose it was seeking lost-profit damages until after the close of written discovery. It also argues that Langan's testimony about Aesthetic Elements' damages strayed into the realm of undesignated expert opinion.[8]

We need not decide these issues because the "the erroneous admission of evidence does not require reversal unless a substantial right of the party is affected." *Konchar v. Pins*, 989 N.W.2d 150, 162 (Iowa 2023) (internal quotation marks omitted) (citation omitted). "The burden rests upon the appellant not only to establish error but to further show that prejudice resulted." *Id.* (cleaned up). Meera has not made that showing.

The jury did not award lost-profit damages to Aesthetic Elements. Meera suggests that "perhaps" Langan's lost-profits testimony encouraged the jury to "compromise" by awarding liquidated damages, and that the jury might "have opted for . . . a lower number of unjust enrichment damages" had it never heard evidence about Aesthetic Elements' actual damages. But this argument is too speculative

---

[8] In its reply brief, Meera also argues for the first time that Exhibit 35, which Steve Langan relied on in his testimony about Aesthetic Elements' damages, should have been excluded as inadmissible hearsay and improper summary evidence. Absent exceptional circumstances, we do not consider issues raised for the first time in a reply brief. *Villa Magana v. State*, 908 N.W.2d 255, 260 (Iowa 2018).

to carry Meera's burden.  Further, even assuming Langan's anticipated testimony was inadequately disclosed, that did not stop Meera from examining Langan at length about the reliability of his calculations at trial.  We accordingly reject this assignment of error.

### F.    Spoliation Instruction

Last, Meera challenges the district court's rulings on Exhibit 34—a screenshot of the October 15, 2020 email by which Cody Langan transmitted Aesthetic Elements' scope of work to Jeff Martin.  According to Meera, this evidence should have been excluded because "Aesthetic Elements never produced the original email or took reasonable steps to do so."  Meera further argues that Aesthetic Elements' lack of "a satisfactory explanation" for why it could not produce an original copy entitled Meera to a spoliation instruction.

On these issues, Meera fails to show any reversible error.  Cody Langan testified that he could not forward or retrieve the email after Aesthetic Elements' web host made changes to its email service during the litigation.  Langan testified he spent hours trying to retrieve the email from an old mailbox on his iPad, but a screenshot was the best he could do.  Given this testimony, the district court properly concluded that Aesthetic Elements' failure to produce an original copy fell short of spoliation.  *See Lynch v. Saddler*, 656 N.W.2d 104, 107 (Iowa 2003) (explaining a party seeking a spoliation instruction must "show both intentional destruction and control of the evidence," and that a "spoliation inference should be utilized prudently and sparingly" (citation omitted)).  And the court was within its discretion to decline exclusion on discovery grounds.

**IV.     Conclusion**

Having considered all the challenges raised by Meera on appeal, we affirm the jury's verdict awarding Aesthetic Elements $93,329 in liquidated damages for Meera's breach of the parties' enforceable service agreement.

**AFFIRMED.**