# IN THE COURT OF APPEALS OF IOWA

No. 19-0739
Filed May 13, 2020

**ALEXANDER SHCHARANSKY and TATIANA SHCHARANSKY,**
  Petitioners-Appellees/Cross-Appellants,

**vs.**

**VADIM SHAPIRO, BORIS PUSIN, ILYA MARKEVICH, ALEX KOMM and DMITRY KHOTS,**
  Respondents-Appellants/Cross-Appellees.

_____

**VADIM SHAPIRO, BORIS PUSIN, ILYA MARKEVICH, ALEX KOMM and DMITRY KHOTS,**
  Cross-Petition Plaintiffs/Appellants,

**vs.**

**BORIS SHCHARANSKY, ZOYA STAROSELSKY, LEONID SHCHARANSKY, and SLAVA STAROSELSKY,**
  Cross-Petition Defendants/Appellees.

_____

**VADIM SHAPIRO, BORIS PUSIN, ILYA MARKEVICH, ALEX KOMM and DMITRY KHOTS,**
  Third-Party Petition Plaintiffs/Appellants,

**vs.**

**CONTINUOUS CONTROL SOLUTIONS, LLC,**
  Third-Party Defendant/Appellee.

_____

Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.


The cross-petition plaintiffs and third-party petition plaintiffs appeal from jury

verdicts finding against their claims for breach of contract and reimbursement. As

respondents, they also challenge the scope of the trial as to the contribution claim

against them, arguing they should have been allowed to present affirmative defenses. The petitioners cross-appeal, challenging the district court's ruling they were not entitled to prejudgment interest on their contribution claim. **AFFIRMED ON APPEAL; REVERSED AND REMANDED WITH DIRECTIONS ON CROSS-APPEAL.**

Jaki K. Samuelson and Anna E. Mallen of Whitfield & Eddy, P.L.C., Des Moines, for appellants.

Mark E. Weinhardt and Danielle M. Shelton of The Weinhardt Law Firm, Des Moines, for appellees.

Considered by Bower, C.J., Ahlers, J., and Potterfield, S.J.* Blane, S.J., takes no part.

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**POTTERFIELD, Senior Judge.**

Together, the Shapiro Group[1] and members of the Shcharansky Group[2] owned and operated Continuous Control Solutions, Inc. (CCS). Then in 2007, the Shcharansky Group purchased the Shapiro Group's shares of CCS through the execution of a stock purchase agreement—ending the Shapiro Group's part in the business.[3] That agreement, and what followed, have been the focus of nearly a decade of litigation.

In this third appeal, we are asked to determine if the district court properly limited the scope of the 2018 trial, based on the ruling of our supreme court in *Shcharansky v. Shapiro*, 905 N.W.2d 579, 588 (Iowa 2017), so as not to include evidence of the Shapiro Group's alleged affirmative defenses to Alexander and Tatiana Shcharansky's contribution claim against them. Additionally, regarding their cross-claims for breach of contract and reimbursement, the Shapiro Group maintains the district court should have granted their motions for directed verdict, judgment notwithstanding verdict (JNOV), or new trial. Alexander and Tatiana Shcharansky cross-appeal, arguing the district court erred in its determination they were not entitled to prejudgment interest for their contribution claim; they otherwise ask that we affirm.

---

[1] The Shapiro Group includes Vadim Shapiro, Boris Pusin, Ilya Markvich, Alex Komm, and Dmitry Khots.

[2] The Shcharansky Group includes Alexander, Tatiana, Boris, and Leonid Shcharansky and Zoya and Slava Staroselsky. Alexander and Tatiana are married. Boris and Alexander are brothers; they are the sons of Leonid Shcharansky. Slava and Zoya Staroselsky are husband and wife.

[3] Alexander and Boris Shcharansky and Zoya Staroselsky were the buyer-members of the Shcharansky Group; only these three members of the Shcharansky Group signed the stock purchase agreement. Leonid Shcharansky and Slava Staroselsky were then appointed to the board of directors of CCS.

**I. Background Facts and Proceedings.**

Prior to September 2007, while both the Shapiro Group and members of the Shcharansky Group owned and operated CCS, the company borrowed $900,000 from Wells Fargo Bank.[4]  Individual members of the Shapiro and Shcharansky Groups personally guaranteed the debt.[5]

The Shapiro Group decided to sell their shares of CCS and get out of the business.  In September 2007, the two groups—with the Shapiro Group as the sellers and Alexander and Boris Shcharansky and Zoya Staroselsky of the Shcharansky Group as the buyers—executed a stock purchase agreement.  The agreement contained this provision:

> 7.1  **Buyers' Covenants**.  In connection with the transfer of the Shares to the Buyers pursuant to this Agreement, the Buyers hereby covenant that as the controlling shareholders of the Corporation, the Buyers will cause the Corporation to:
>       (a) Use best efforts to, and prior to the payment of any existing or new debt obligations payable by the Corporation to any Buyer or any Buyer's immediate relative or any entity affiliated with any Buyer or any Buyer's immediate relative, satisfy and repay in full all debt obligations of the Corporation owed to Wells Fargo Bank.

After the execution of the stock purchase agreement, Leonid Shcharansky and Slava Staroselsky—other members of the Shcharansky Group—were appointed to CCS's Board of Directors.

---

[4] CCS took out two separate loans; one for $150,000 and the other for $750,000.  As it is unnecessary for the basis of this appeal, we do not distinguish between the two.

[5] Originally all members of the Shapiro Group and the three buyer-members of the Shcharansky Group guaranteed the loans.  Tatiana Shcharansky later became a guarantor as well, making nine individual guarantors in total.

From the time the Shcharansky Group became the sole owners and operators of CCS through May 30, 2009, CCS made no payments toward the Wells Fargo debt.

In April 2009, Wells Fargo obtained judgment against CCS and the individual guarantors for the principal amount, late fees, accrued interest, and attorney fees. The judgment was for more than $960,000.

On June 1, 2009, CCS and Alexander Shcharansky entered into a forbearance agreement with Wells Fargo. In exchange for the bank's agreement to forgo execution of the judgment, CCS agreed to pay $400,000 upon the execution of the forbearance agreement and deliver additional collateral in the form of a mortgage and security agreement for property in New York owned by Tatiana Shcharansky, who is married to Alexander.[6] Additionally, CCS and Alexander agreed to make "eight equal quarterly installments of principal and accrued interest, each in the amount of $76,022.11, commencing on the first day of September, 2009 and on the first day of each December, March and June thereafter" with "all unpaid principal and accrued interest on the Indebtedness . . . fully due and payable on June 1, 2011."

CCS made the initial $400,000 payment and the first three quarterly payments of $76,022.11. Alexander Shcharansky personally made the June 2010 payment and Tatiana personally made the September payment—though not until September 10. In December, rather than making the next payment of $76,022.11, Tatiana paid off the remaining judgment—$241,935.92.

---

[6] Tatiana had not previously personally guaranteed the CCS debt, but she executed a guaranty at this point.

In January 2011, Alexander and Tatiana Shcharansky filed a petition for contribution against the Shapiro Group, claiming Alexander and Tatiana paid more than their equitable share of the judgment against CCS. They sought 5/9 of the total they personally paid, or $218,877.[7]

The Shapiro Group responded, filing their answer, affirmative defenses, counterclaims, and cross-claims. The Shapiro group maintained Alexander's claimed breach of the stock purchase agreement to cause CCS to repay the Wells Fargo loans precluded his and Tatiana's right and ability to seek equitable contribution. They asserted it was Alexander's conduct that caused any injury or damage he sustained and that the claims were barred "in whole or in part by the doctrines of waiver, estoppel and unclean hands." In their counterclaims and cross-claims, the Shapiro Group alleged the buyer-members of Shcharansky Group breached the stock purchase agreement by failing to use their best efforts to have CCS repay its debt obligations to Wells Fargo and causing CCS to make payments to members of the Shcharansky Group before paying the Wells Fargo debt.[8] The Shapiro Group also raised a counterclaim of tortious interference with a contract, alleging Leonid Shcharansky and Slava Staroselsky (CCS board members) caused CCS to make improper and excessive payments to parties and party relatives rather than satisfying the debt owed to Wells Fargo.

---

[7] Alexander and Tatiana paid $393,980.14 of CCS's Wells Fargo debt, which was guaranteed by nine individuals. They sought 5/9 of that total in contribution from the five Shapiro Group members.

[8] The Shapiro Group also raised a claim of fraudulent misrepresentation, which they later asked the court to dismiss.

In May 2012, the Shapiro Group moved for partial summary judgment. They asserted there was no genuine issue of material fact pertaining to either Alexander and Tatiana Shcharansky's contribution claim or the Shapiro Group's breach-of-contract counterclaim. The Shapiro Group claimed Alexander and Tatiana Shcharansky's claim for contribution failed as a matter of law because the money Alexander and Tatiana used to pay CCS's debt was not their own money. Additionally, the Shapiro Group argued the undisputed facts showed Alexander, as president of CCS, had chosen to use CCS's money to repay loans to the company from family and other members of the Shcharansky Group rather than using those company funds in payment of the Wells Fargo debt. The Shapiro Group maintained this was a clear breach of the stock purchase agreement. Alexander and Tatiana Shcharansky resisted, arguing their contribution claim was not precluded because they used funds that were loaned to them in order to pay the Wells Fargo debt. They maintained the Shapiro group had received a benefit when the Wells Fargo debt was paid off since the members of the Shapiro Group had personally guaranteed the loan, and they asserted CCS had been unable to pay the loan.

In August, the district court granted the Shapiro Group's motion for partial summary judgment. The court ruled that Alexander and Tatiana Shcharansky did not use their own money in paying CCS's debt to Wells Fargo; "[i]nstead, Alex and Tatiana were mere conduits for their parents' money that was transferred to them specifically for the purpose of paying" the obligation. The court determined this precluded their claim for contribution from the Shapiro group. Additionally, the court concluded "that the Shapiro Group established its breach of contract

counterclaim as a matter of law." It concluded the buyers' covenant of the stock purchase agreement "clearly and unambiguously provides both a requirement of best efforts *and* that prior to the payment of any existing or new debt obligations payable by [CCS] to any buyer or buyer's immediate relative." Noting the undisputed facts that before the Wells Fargo debt was discharged in December 2010 (with non-CCS funds), CCS paid $90,000 on a loan obligation to an entity owned by three members of the Shcharansky Group, $172,000 to Leonid Shcharansky, $95,000 to Alexander Shcharansky, and $25,000 to Tatiana Shcharansky, the court concluded the buyer-members of the Shcharansky Group breached the stock purchase agreement.

The Shcharanskys appealed. In *Shcharansky v. Shapiro*, No. 13-0151, 2013 WL 6116883 (Iowa Ct. App. Nov. 20, 2013), this court reversed the ruling that Alexander and Tatiana Shcharansky were not entitled to contribution as a matter of law, ruling there were genuine issues of material fact that must be decided by a fact finder, including whether members of the Shapiro Group were co-guarantors and whether the funds Alexander and Tatiana used to discharge CCS's Wells Fargo debt were loans or gifts. Additionally, the court ruled, "In light of our determination that genuine issues of material fact exist on the Shcharansky Group's contribution claim, it necessarily follows that the Shapiro Group is unable to establish a breach of contract claim predicated on damages stemming from the contribution claim at the summary judgment stage." *Shcharansky*, 2013 WL 6116883. The case was remanded to the district court for further proceedings. *Id.*

Back at the district court on remand, the Shapiro Group requested leave to file a third-party claim against CCS for reimbursement, asserting that if the Shapiro

Group was found liable to the Alexander and Tatiana Shcharansky for contribution, the Shapiro Group had a claim for reimbursement from CCS.  The district court granted the motion.

The court bifurcated Alexander and Tatiana Shcharansky's claim for contribution from the Shapiro Group's counterclaim, cross-claim, and third-party claim, noting the second part of the trial would be unnecessary if Alexander and Tatiana could not prove their right to contribution from the Shapiro Group.

The first part of the bifurcated proceedings was tried to the bench in December 2015.  In its written ruling, the court found "the evidence clearly demonstrated that [Alexander's and Tatiana's] parents actually made the payments to Wells Fargo and that the monies simply passed through [Alexander's and Tatiana's] bank accounts on their way to Wells Fargo."  Finding the money given to Alexander and Tatiana by their parents were not loans with any legal obligations to return the money, the court ruled the Alexander and Tatiana's claim for contribution was not yet ripe, as they had not personally made more than their share of repayment on CCS's Wells Fargo loan.  Based on this ruling, the court dismissed as moot the Shapiro Group's counterclaims, cross-claims, and third-party claims.  The Shcharanskys again appealed.

In *Sharansky v. Komm*, No. 16-1265, 2017 WL 2875690, at *5 (Iowa Ct. App. July 6, 2017), this court affirmed the district court ruling, stating, "Although the money used to discharge the joint debt came from [Alexander's and Tatiana's] accounts, they have been unable to establish that they personally were forced to bear more than their just share of the debt.  Thus, we affirm the district court's dismissal of their action for contribution."

The Shcharanskys sought further review, which our supreme court granted. In *Shcharansky v. Shapiro*, 905 N.W.2d 579, 580 (Iowa 2017), the supreme court vacated the 2017 court of appeals ruling and reversed the judgment of the district court. The court decided that the sources of the funds used to pay the underlying debt were inapposite, noting "there is no evidence supporting the conclusion that the transfer of funds from the parents to [Alexander and Tatiana] was artificial or the subject of a scheme to defraud the Shapiro Group." *Shcharansky*, 905 N.W.2d at 588. The court remanded the case to the district court, instructing:

> While the issues were bifurcated for purposes of separate trials, the claims, counterclaims, and cross-claims remain part of a single court case. Further, the counterclaims, cross-claims, and third-party claims of the Shapiro Group appear to be intertwined with the Shcharanskys' contribution claim. The Shapiro Group may be entitled to recover on their theories against various cross and third-party defendants only to the extent that it is liable to the Shcharanskys for contribution.
>
> We therefore hold only that the Shcharanskys are entitled to contribution from the Shapiro Group on the undisputed facts of this case. We remand the case to the district court for further proceedings on the Shapiro Group's claims against the Shcharanskys.

*Id.*

Before the district court for the third time, on October 22, 2018, Shapiro Group filed a motion asking the court to establish the scope of the trial. The Shapiro Group argued the supreme court's 2017 decision in favor of Alexander and Tatiana Shcharansky's contribution claim did not consider or rule upon the Shapiro Group's affirmative defenses to the claim, leaving those issues for the jury to decide in the upcoming trial.

In a written ruling, the district court concluded the Shapiro Group's affirmative defenses to the contribution claim were no longer viable. Focusing on the supreme court's "instructions on remand," the district court ruled:

> The supreme court stated that "the Shcharanskys are entitled to contribution from the Shapiro Group on the undisputed facts of this case" and that it is to conduct further proceedings "on Shapiro-Group's claims against the Shcharanskys." The court does not state that the district court should conduct proceedings on whether the Shcharanskys may prevail in light of the affirmative defenses to the claim for contribution. It is the duty of this court to honor and respect the ruling and mandate by the appellate court in this case. As such, because the supreme court's ruling does not address the affirmative defenses to the contribution claim, this court must follow the direction of the supreme court and address only the Shapiro Group's claims against the Shcharanskys.

Deciding Alexander and Tatiana Shcharansky had already won their contribution claim, the district court limited the scope of the trial to the Shapiro Groups' claim of breach of contract against the buyer-members of the Shcharansky Group (Alexander and Boris Shcharansky and Zoya Staroselsky), tortious interference with a contract against Leonid Shcharansky and Slava Staroselsky of the Shcharansky Group, and their cross-claim for reimbursement from CCS.

A multiple-day jury trial began on October 29, 2018. At the parties' agreement, the court gave the jury a preliminary instruction before trial began that summarized the case. It said:

> This is a lawsuit about a business contract. On one side of the dispute are members of a group called the Shapiro Group. . . . On the other side of the dispute are members of a group called the Shcharansky Group. . . .
> A number of years ago members of both groups co-owned a company called Continuous Control Solutions, LLC, which we will call "CCS" in this trial. Members of the Shapiro Group had majority control of CCS. CCS borrowed $900,000 from Wells Fargo Bank. Members of both the Shapiro Group and the Shcharansky Group personally guaranteed that CCS would pay the debt to Wells Fargo.

In 2007, a dispute developed between the Shapiro Group and the Shcharansky Group concerning the financial difficulites of CCS.

At this time the Shapiro Group transferred its shares of the CCS stock to three members of the Shcharansky Group, Alexander Shcharansky, Boris Shcharansky, and Zoya Staroselsky. That transfer is called the Stock Purchase Agreement. This is the business contract at issue in this lawsuit. The Stock Purchase Agreement had a clause in it called the "best efforts" clause. Under that clause, Alexander Shcharansky, Boris Shcharansky, and Zoya Staroselsky, the "Buyers," promised to cause CCS to use best efforts to, and prior to the payment of any existing or new debt obligations payable by [CCS] to any Buyer or any Buyer's immediate relative or any entity affiliated with any Buyer or any Buyer's immediate relative, satisfy and repay in full all debt obligations of [CCS] owed to Wells Fargo Bank.

When CCS could not pay the debt to Wells Fargo, Wells Fargo sued all of the members of the Shapiro Group and the Shcharansky Group who gave personal guarantees that they would pay the debt. Alexander Shcharansky then entered into an agreement with Wells Fargo to give CCS additional time to pay the debt. In 2010, after CCS had paid over half of the Wells Fargo debt, Alexander Shcharansky and his wife Tatiana Shcharansky repaid all of the remaining outstanding debt themselves. They then filed this lawsuit to have the members of the Shapiro Group reimburse them for their proportional shares of those payments. This court has already determined that Alexander and Tatiana are entitled to contribution from the members of the Shapiro Group, meaning that their claim for reimbursement has been established.

Now, the members of the Shapiro Group claim that they are entitled to damages for breach of the "best efforts" clause. First, they allege that Alexander, Boris, and Zoya breached that clause. Second, they allege that two other members of the Shcharansky Group, Leonid Shcharansky and Slava Staroselsky, intentionally interfered with the performance of the "best efforts" clause. Third, they allege that CCS is obligated to reimburse them for any amounts for which they must reimburse Alexander and Tatiana. Your job will be to decide those claims.

Little evidence was in dispute at trial. Alexander Shcharansky, the president of CCS and one of the buyers, agreed that CCS paid back loans from Shcharansky Group members and their families before paying the Wells Fargo debt. The amount paid back was in excess of $380,000. This occurred before Alexander and Tatiana Shcharansky personally paid approximately $394,000 of CCS's debt

to Wells Fargo. Each side had an expert testify—an accountant who had reviewed CCS's financials. Each was asked about various payments CCS made to members of the Shcharansky Group and their opinion of the financial health or capacity of the company.

In closing, the two sides focused on the meaning of the "best efforts" language in the buyers' covenants of the stock purchase agreement. The Shapiro Group urged the jury to conclude that the contract imposed two separate obligations on the buyers—to cause CCS to use its best efforts to repay the Wells Fargo debt and to not make any payments "to any Buyer or any Buyer's immediate relative or any entity affiliated with any Buyer or any Buyer's immediate relative" before the Wells Fargo debt was paid off. The Shapiro Group maintained that it was not contesting CCS's need to take loans from Shcharasnky Group members to "keep the doors open"—they were arguing the choice to pay back those loans before or instead of paying off the Wells Fargo debt breached the contract. In contrast, the Shcharansky Group urged the jurors to conclude the relevant language of the stock purchase agreement created only one obligation: that the buyers use their best efforts to have CCS repay the Wells Fargo debt prior to paying debts to related parties. Additionally, the Shcharansky Group urged that even if their reading of the contract was wrong—even if it imposed two obligations—that the Shapiro Group had failed to show a link between the buyers' breach and the remaining Wells Fargo debt that Tatiana and Alexander paid (as opposed to CCS).

With the verdict form, the jury was asked if the Shapiro Group proved Alexander or Boris Shcharansky or Zoya Staroselsky breached the stock purchase

agreement; the jury marked "no" as to each of the three. The jury was asked whether the Shapiro Group proved either Leonid Shcharansky or Slava Staroselsky intentionally interfered with the "best efforts" clause of the stock purchase agreement, and the jury answered "no" to each. As directed, because the jury answered "no" to the first five questions, it did not answer question 6—the amount of damages incurred by the Shapiro Group as a result of any of the preceding. In question 7, the jury was asked whether the Shapiro Group proved they were entitled to reimbursement from CCS for the amounts they were compelled to pay on the Wells Fargo debt, and the jury marked "no." In question 8, the jury wrote "0" on the line for the amount of damages proved.

A few days later, Alexander and Tatiana Shcharansky moved the court to enter judgment and asked the court to order "interest at the statutory rate from the filing of the [contribution] claim on January 10, 2011." The Shcharansky Group also asked the court to enter judgment in their favor on the Shapiro Group's claims and to order the Shapiro Group to pay costs.

The Shapiro Group filed a motion for JNOV or, in the alternative, requested a new trial on both the breach-of-contract and the reimbursement claim pursuant to Iowa Rule of Civil Procedure 1.1004(6). The Shcharansky Group resisted.

In one written ruling, the court denied the Shapiro Group's motions for JNOV and new trial. Additionally, the court denied Alexander and Tatiana Shcharansky's request for prejudgment interest, concluding they were not entitled to it on their contribution claim "[b]ased upon the plain language of Iowa Code [section] 625.21."

The court later entered a final judgment order, entering judgment in favor of Alexander Shcharansky in the amount of $8446.90 against each of the Shapiro

Group members and judgment in favor of Tatiana Shcharansky in the amount of $35,328.69 against each of the Shapiro Group members.

The Shapiro Group appeals,[9] and Alexander and Tatiana Shcharansky cross-appeal.

**II. Discussion.**

**A. Breach-of-Contract Claim.**

The Shapiro Group urges that the buyers' covenant of the stock purchase agreement is unambiguous and allows for only one reasonable interpretation—that the contract required the buyers (1) to cause CCS to use its best efforts to repay the Wells Fargo debt and (2) to not make any payments "to any Buyer or any Buyer's immediate relative or any entity affiliated with any Buyer or any Buyer's immediate relative" before the Wells Fargo debt was paid off. The Shapiro Group maintains the court should have interpreted the relevant language of the stock purchase agreement rather than allowing the jury to do so. And, because it is undisputed that the buyers caused CCS to pay back the buyers and their families before paying off the Wells Fargo debt, the Shapiro Group argues the court should have determined as a matter of law that the buyers breached the stock purchase agreement and entered judgment in favor of the Shapiro Group.

They purportedly moved for directed verdict, JNOV, and new trial under this theory and urge us to consider and reverse each of the district court's rulings.

**1. Motions for Directed Verdict and JNOV.** The Shapiro Group argues the district court erred in denying their motions for directed verdict and for JNOV

---

[9] On appeal, the Shapiro Group has not raised any issues regarding the tortious-interference claim against Leonid Shcharansky and Slava Staroselsky.

on the breach-of-contract claim. While the Shcharansky Group does not challenge error preservation, we conclude this issue has not been preserved for our review. "On appeal, an appellate court's review is limited to those grounds raised in the defendant's motion for a directed verdict." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 844 (Iowa 2010). "A motion for judgment notwithstanding the verdict must stand on grounds raised in the directed verdict motion." *Id.* at 845. And "[e]rror must be raised with some specificity in a directed verdict motion." *Id.*

When the Shapiro Group moved for directed verdict on the breach-of-contract claim, they stated, "Just for the reasons that I previously stated we believe that all elements of breach of contract and [tortious] interference have been—have been developed as a matter of law." It is unclear what "reasons previously stated" the Shapiro Group referred to.[10] Their statements immediately before—in response to the Shcharansky Group's motion for directed verdict—were arguments that the breach-of-contract claim was not foreclosed by the Iowa Supreme Court's 2017 ruling. In their pretrial brief, filed approximately ten days before they moved for directed verdict, the Shapiro Group alluded to their understanding of the meaning of the stock purchase agreement, claiming, "In the Stock Purchase Agreement, Alexander Shcharansky promised to cause CCS to use its best efforts to repay the Wells Fargo loans in full, and to do so prior to the repayment of any existing or new debt obligation to any buyer or any buyer's

---

[10] In their later motion for JNOV, the Shapiro Group claimed that in making their motion for directed verdict, they "further relied upon the arguments and authorities provided to the Court in its Scope of Trial submission and Trial Brief." We assume their reliance on "reasons previously stated" is a request to incorporate arguments in prior filings, but the content was not clear at the time of the motion for directed verdict.

relatives or affiliated entities." This is not enough to preserve this issue for our review. Especially as it is not clear the trial court understood the Shapiro Group's reference; it did not rule on the motion for directed verdict with any specificity, stating only, "And again, [the court] believe[s] that there are sufficient matters in dispute taking the reasonable inferences for the nonmoving party, in this case the Shcharansky Group. There are sufficient—there is sufficient evidence that a reasonable jury could find on those matters and the Court would as a result deny the Shapiro Group's motion for directed verdict."

**2. Motion for New Trial.** The Shapiro Group raised the same argument in their motion for new trial, claiming the jury's verdict "is not sustained by sufficient evidence, or is contrary to the law." Iowa R. Civ. P. 1.1004(6). "We review the denial of a motion for new trial based on the grounds asserted in the motion." *Fry v. Blauvelt*, 818 N.W.2d 123, 128 (Iowa 2012) (citation omitted). We review motions based on rule 1.1004(6) for errors at law. *See id.*

Assuming without deciding that the stock purchase agreement is unambiguous and permits only the Shapiro Group's interpretation, they established the buyers breached the contract by causing CCS to make payments to themselves and family members before CCS's Wells Fargo debt was paid off. But in viewing the evidence in the light most favorable to the Shcharansky Group, the Shapiro Group did not prove damages related to that breach. *See, e.g.*, *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (providing as an element of breach of contract that the complaining party must prove "that plaintiff has suffered damages as a result of the breach"); *see also Estate v. Pearson ex rel. Latta v Interstate Power and Light Co.*, 700 N.W.2d 333,

345 (Iowa 2005) ("In reviewing the motion for new trial, '[w]e view the evidence in the light most favorable to the verdict and need only consider the evidence favorable to [the verdict] whether it is contradicted or not.'" (alteration in original) (citation omitted)).

The evidence presented at trial could show CCS was in financial trouble and close to shuttering in 2007 when the Shapiro Group left the company in the hands of the Shcharansky Group. How the Wells Fargo debt would be handled was the key focus in negotiating the stock purchase agreement, as it was the only debt of the company the members of the two groups had individually guaranteed and Wells Fargo was allowed to pursue any and all of them if CCS failed to repay the debt.

CCS began taking and repaying short-term loans from its owners (the buyers) and members of the owners' families in order to keep the company's doors open while it obtained new contracts and waited on payment for others. These loans were only given because CCS promised to repay the money quickly—for example, before a family member incurred a penalty for taking money out of their retirement account prematurely. By taking these loans, the company was able to stay afloat and, in doing so, paid approximately $640,000 on the Wells Fargo debt in 2009 and 2010, before Alexander and Tatiana personally repaid the remaining $394,000 debt in the second half of 2010.

Even the Shapiro Group's expert did not unequivocally opine CCS could have paid more of the Wells Fargo debt. The expert testified that in looking at the gross revenue minus all of the expenses of CCS from November 2010 to May 2011—a period the Shapiro Group asked him to look at specifically—the company

had a "net income" of $1.4 million. During direct examination, the expert was then asked, "Would the company have the net income available to make payments on that Wells Fargo debt?" He responded:

> It would depend somewhat on the mix of the income and whether the receivables increase and so forth. If all that, if in a perfect world all this converted to cash and it was cash coming in the door minus the expenses going out, yes, they would have 1.[4] million dollars worth of profit.

On cross-examination, the Shapiro Group's expert agreed that showing $1.4 million profits on the financial statements did not mean that much cash came into the business during that period. Specifically, part of the $1.4 million net income was based on the fact that a Shcharansky-family owned company forgave $425,000 in debt CCS owed it during that period. The expert also agreed there could be other noncash transactions affecting what he reported as the net income.

The Shcharansky Group expert testified he "reviewed party loan activities to determine whether or not any of that activity impaired the company's ability to make payments to Wells Fargo Bank." He opined a better metric to measure CCS's ability to pay more of the Wells Fargo debt was "net working capital," which he described calculating by

> look[ing] at what's called current assets. And current assets are, essentially, cash and things that are expected to become cash within the next twelve months, and so you could look at that as a closer measure of a company's ability to come up with cash to make payments. And you could compare that to current liabilities and current liabilities are, essentially, obligations that are expected to come due within the next twelve months.

He further explained that "[a] company with negative net working capital, it says that they have more obligations coming due than they have resources on hand right now. And so a negative working capital balance . . . would indicate that a

company does not have the ability to make cash payments." Generally using CCS's yearly balance sheets from their tax returns, the Shcharansky Group expert indicated CCS had a negative net working capital every year between 2007 and May 2018—the last point at which the expert was asked to consider leading up to trial. He went further, opining that while he had not reviewed the balance sheet for every single day over the decade-long period, he had "a high degree of confidence that the company has just never dug themselves out of the hole they've been in since 2007, 2008." He testified that companies with cash-flow issues, like CCS, would need short-term loans in order to not go out of the business "because if you can't pay your employees and you can't pay your vendors, you just can't stay in business." When asked what would have happened to the Wells Fargo debt if CCS shuttered rather than taking short-term loans from related parties, the expert testified:

> Wells Fargo would not have been paid in full, for sure. I mean, since the beginning balance sheet that we looked at earlier in this testimony, the company's net equity balance has been negative, and the company never had the ability to pay off all of its liabilities. And so the Wells Fargo debt certainly would have been unpaid at least in part at any point in time in the last decade.
> . . . .
> I would say the short-term loans increased the probability that Wells Fargo can be paid back. If the company had not borrowed these funds, then they could have gone out of business a long time ago. The fact that they are able to stay in business allowed the company to pay . . . over $600,000 back to Wells Fargo. And they would not have been able to do that had the company gone bankrupt prior to 2009.

Even if we assume the buyers breached the stock purchase agreement, there is not substantial evidence in the record to support the Shapiro Group's claimed

damages are related to the breach. Thus, the district court did not err in denying the motion for new trial.

**B. Reimbursement Claim.** The Shapiro Group sued CCS as a third-party defendant for reimbursement of the amount of their liability for contribution. The Shapiro Group maintained that if they had to contribute to Alexander and Tatiana for the part of CCS's obligation to Wells Fargo that Alexander and Tatiana paid personally, then CCS was required to reimburse the Shapiro Group members for that amount. *See Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 772 (Iowa 2009) (adopting the Restatement (Third) of Suretyship and Guaranty and stating, "Under the Restatement, when a principal obligor has notice of the secondary obligation, the principal obligor has the duty to reimburse the secondary obligor to the extent the secondary obligor is called upon to perform, or if the secondary obligor settles with the obligee").

The parties agreed that in order for the Shapiro Group to be successful on their reimbursement claim against CCS, the Shapiro Group needed to prove all of the following:

> 1. As between CCS and the Shapiro Group, CCS was the principal obligor to Wells Fargo.
> 2. CCS and the Shapiro Group[11] did not make an express agreement regarding the obligations of CCS should the Shapiro Group pay or be compelled to pay the debt owed to Wells Fargo pursuant to the personal guarantees.

---

[11] We note this is not the instruction given to the jury. While discussing the jury instructions before closing arguments, the Shapiro Group asked the court to change the second element from "The parties did not make an express agreement . . ." to "CCS and the Shapiro Group did not make an express agreement . . ." for purposes of clarity. The Shcharansky Group did not resist the change, and the court agreed to do so. However, the final instructions given to the jury did not include the edit.

3. The Shapiro Group has been ordered to make payments on the debt owed to Wells Fargo pursuant to the personal guarantees.

4. The Shapiro Group has been damaged by CCS's failure to make payments on the debt owed to Wells Fargo.

At the close of the evidence, it had been established that CCS was the primary obligor on the Wells Fargo debt while the members of the Shapiro Group were secondary obligors; Alexander and Tatiana Shcharansky had already won their contribution claim against the Shapiro Group members and the Shapiro Group would be ordered to make payments on that claim; and the Shapiro Group had been damaged by CCS's failure to pay the debt.

That left only the second element at issue. Under the Restatement (Third) of Suretyship and Guaranty, the default rule is that the primary obligor owes the secondary obligors if the secondary obligors settle the debt. *See* § 22 cmt. a (Oct. 2019 Update) ("Just as the principal obligor impliedly agrees that it will perform the underlying obligation so that the secondary obligor will not have to perform, the principal obligor also agrees that it will reimburse the secondary obligor to the extent that the secondary obligor does perform, thereby fulfilling all or part of the underlying obligation."). This default can be overcome by an express agreement limiting or foreclosing the secondary obligors' right to reimbursement. *See Hills Bank*, 772 N.W.2d at 773 (noting the primary obligor has a duty to reimburse a secondary obligor because "the law raises an implied promise, unless there is an express one"). More specifically, the question at issue here was whether the stock purchase agreement relieved CCS of its implied promise to reimburse the Shapiro Group if they were forced to pay the Wells Fargo debt.

**1. Motions for Directed Verdict and JNOV.** As with their motion for directed verdict on the breach-of-contract claim, the Shapiro Group's motion regarding the reimbursement claim was not presented with enough specificity for us to review the issue on appeal.[12] The Shapiro Group noted the element in dispute was whether a contractual obligation controlled CCS's duty to reimburse, but, when making their motion for directed verdict, they did not make any argument based on the evidence presented at trial nor offer legal analysis regarding why the stock purchase agreement was not an express agreement controlling the issue of reimbursement. They stated:

> [M]oreover your Honor, we as I said earlier we disagree, but there is [not] a contractual obligation that takes this out of the realm of that. And I would draw the Court's attention to comment A section 22 of that restatement section that's been accepted by this Court. And it discusses the underlying obligation that this is—that this legal contribution claim is necessary to—because when a secondary obligor satisfies the obligation of a primary obligor that the primary obligor is enriched considering that it is—it receives its money which it should not, or receives its benefit and which it should not have. And at the expense of the secondary obligor and that is consistent with what [the Shcharansky expert witness] testified today that Tatiana paying off the loan was considered debt forgiveness. It was considered on the income category of CCS.
>      Again, CCS got a benefit from the secondary obligor paying off this debt. And for those reasons we would request that the Court find that the elements of the legal—legal reimbursement claim have been established as a matter of law and grant a directed verdict on that claim as well as the other two claims presented by the Shapiro Group.

In their motion for JNOV, the Shapiro Group addressed the issue with more specificity, stating:

> During closing argument, the Shcharansky Group's counsel suggested the Stock Purchase Agreement was an express agreement that superseded CCS's legal obligation to reimburse the

---

[12] The Shcharansky Group contests error preservation on this issue.

Shapiro Group. This argument is illogical and unfounded based on the plain language of the Stock Purchase Agreement.

While CCS, the entity, was a signatory to the Stock Purchase Agreement [(SPA)], it was only because a lawsuit currently pending against CCS was being dismissed as part of the SPA, and the Shapiro Group was resigning as shareholders, resignations that needed to be formally accepted CCS. The relevant language of Section 7.1 was a covenant between the Buyers, the individual members of the Shcharansky Group, and the Sellers, the individual members of the Shapiro Group. CCS made no promises as part of Section 7.1. Moreover, no part of Section 7.1, nor the SPA in general, a fully integrated agreement, speaks to a separate arrangement between CCS and the members of the Shapiro Group (or the Shcharansky Group) should those members be compelled to pay pursuant to their Wells Fargo personal guaranties. Moreover, there was no testimony from any witness nor any document presented at trial that addressed any sort of separate agreement on that issue. Accordingly, even taking the evidence in a light most favorable to the Shcharansky Group, all four elements of the legal reimbursement against CCS were established at trial, and no reasonable juror could find otherwise.

But, as we noted before, the motion for JNOV must stand on the grounds raised in the motion for directed verdict.[13]

We give no further consideration to the Shapiro Group's claims the district court erred in denying their motions for directed verdict and for JNOV on the reimbursement claim. *See Konicek v. Lommis Bros., Inc.*, 457 N.W.2d 614, 617 (Iowa 1990) ("A judgment notwithstanding verdict must stand or fall on the grounds stated in the motion for directed verdict. On appeal, our review is limited to those grounds.").

**2. Motion for New Trial.** In the their motion for new trial, the Shapiro Group generally argued there was not sufficient evidence to sustain the jury's conclusion that the stock purchase agreement constituted an express agreement that relieved

---

[13] While we recognize the district court rejected the reimbursement claim in its JNOV ruling, we are limited to the motion for directed verdict in our review.

CCS of its implied promise to reimburse the Shapiro Group for the Wells Fargo debt. The district court denied their motion, and we find no error in that decision.

While the stock purchase agreement does not explicitly discuss the issue of reimbursement between CCS as the primary obligor and the Shapiro Group members as the secondary obligors, the evidence at trial could be found to show that this agreement was CCS's and the Shapiro Group's comprehensive agreement regarding the Wells Fargo debt—supplanting any implied promise.

CCS had little, if any, money at the time the stock purchase agreement was executed, and the company was on the verge of bankruptcy. Meanwhile, the Shapiro Group members were each on the hook for the nearly $1 million CCS owed to Wells Fargo. Any implied promise to repay them had little to no value if CCS went bankrupt or became judgment proof.

The Shapiro Group members were very concerned about the outstanding debt and made it the focus of their negotiations regarding the stock purchase agreement. They wanted the buyers and CCS to guarantee the Shapiro Group members would not have to be responsible for discharging CCS's debt personally—suggesting they recognized the lack of value of an implied promise for reimbursement in this situation. But the buyers knew the company was in a precarious financial situation and may not be able to discharge the whole amount, and they refused to include in the stock purchase agreement language that would hold the Shapiro Group harmless in case Wells Fargo sought to enforce the personal guarantees. The "best efforts" clause was the compromise the two sides reached in allocating the risk regarding the unpaid Wells Fargo debt.

Next, the Shapiro Group also argues the stock purchase agreement cannot be an express agreement between them and CCS that overrides the implied promise to reimburse because the buyers' covenant involves the Shapiro Group and the buyers—not CCS. As stated before, the relevant contract language is:

> 7.1 **Buyers' Covenants**. In connection with the transfer of the Shares to the Buyers pursuant to this Agreement, the Buyers hereby covenant that as the controlling shareholders of the Corporation, the Buyers will cause the Corporation to:
> (a) Use best efforts to, and prior to the payment of any existing or new debt obligations payable by the Corporation to any Buyer or any Buyer's immediate relative or any entity affiliated with any Buyer or any Buyer's immediate relative, satisfy and repay in full all debt obligations of the Corporation owed to Wells Fargo Bank.

We agree that "Buyers' Covenants" suggests duties or obligations taken on by the buyers rather than CCS. But the language of the section involves what the buyers promise—"as the controlling shareholders of" CCS—to cause CCS to do in the future. Moreover, CCS is a party to the stock purchase agreement. The first paragraph of the agreement states:

> THIS STOCK PURCHASE AGREEMENT (this "Agreement") is made and entered, effective as of the 16th day of September 2007, by and among, Alex Shcharansky, Boris Shcharansky and Zoya Staroselsky (the "Buyers"), those individuals listed on Schedule A [the Shapiro Group], and Continuous Control Solutions, Inc., an Iowa corporation (the "Corporation").

And Vadim Shapiro signed the contract for the company as its president.

Because the jury's verdict in favor of CCS on the reimbursement claim is sustained by sufficient evidence, the district court did not err in denying the Shapiro Group's motion for new trial.

**C. Scope of Trial.**

The Shapiro Group maintains the district court erred in limiting the scope of the 2018 trial to the Shapiro Group's cross-claims and counterclaims, preventing them from trying their affirmative defenses to Alexander and Tatiana Shcharansky's contribution claim. They moved for new trial based on this alleged error. Because the motion for new trial was "based on a legal question," we review for errors at law. *Clinton Physical Therapy Servs P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 609 (Iowa 2006) (citation omitted).

The Shapiro Group maintains the 2017 ruling of the Iowa Supreme Court in *Shcharansky v. Shapiro*, 905 N.W.2d 579, 588 (Iowa 2017), should not have been understood to foreclose the litigation of their affirmative defenses to the Shcharanskys' contribution claim. They argue that because the Shapiro Group prevailed on the issue of the contribution claim before the district court and this court, it was not "procedurally possible for the affirmative defenses to be considered." They understand the supreme court's lack of mention of the affirmative defenses to mean the court did not consider them—leaving them viable on remand.

We recognize the supreme court's opinion did not mention the Shapiro Group's affirmative defenses. But the Shapiro Group admit in their appellate briefs that they did not "raise[] the affirmative defenses in their briefs for the prior appeal." They assert it would have been improper for them to do so without a trial record or ruling regarding the affirmative defenses from the district court. But the affirmative defenses were tried as part of the 2015 trial to the bench on Alexander and Tatiana Shcharansky's contribution claim. And "[i]t is well-settled law that a prevailing party

can raise an alternative ground for affirmance on appeal without filing a notice of cross-appeal, as long as the prevailing party raised the alternative ground in the district court." *Duck Creek Tire Serv., Inc. v. Goodyear Corners, L.C.*, 7496 N.W.2d 886, 893 (Iowa 2011). "A successful party, without appealing, may attempt to save a judgment on appeal based on grounds urged in the district court but not considered by that court." *Moyer v. City of Des Moines*, 505 N.W.2d 191, 193 (Iowa 1993). Their initial success on the contribution claim at the district court and the court of appeals did not prevent the Shapiro Group from pursuing their affirmative defenses as alternative grounds for affirmance before the supreme court. Their failure to do so waived having those affirmative defenses considered. *See Shcharansky*, 905 N.W.2d at 588 (concluding "the Shcharanskys are entitled to contribution from the Shapiro Group on the undisputed facts" and remanding to the district court only "for further proceedings on the Shapiro Group's claims against the Shcharanskys"); *Ostrem v. Prideco Secure Loan Fund, LP*, 841 N.W.2d 882, 904 (Iowa 2014) ("If we disagree with the basis for the court's ruling, we may still affirm if there is an alternative ground, *raised in the district court and urged on appeal*, that can support the court's decision." (emphasis added)); *In re E.S.*, No. 19-0944, 2019 WL 4678217, at *2 n.3 (Iowa Ct. App. Sept. 25, 2019) (noting that while there were other possible grounds upon which to affirm that were raised in the original petition, the State did "not venture to resurrect any of the other grounds pled in its petition" so those grounds would not be considered).

### D. Prejudgment Interest.

Alexander and Tatiana Shcharansky cross-appeal. They argue the district court erred in ruling against their motion asking the court to enter judgment in their

favor "with interest at the statutory rate from the filing of the claim on January 10, 2011." We review for errors at law on the award (or lack thereof) of prejudgment interest. *See Gosch v. Juelfs*, 701 N.W.2d 90, 91 (Iowa 2005).

Here, the district court determined that Iowa Code section 625.21 prevented the Shcharanskys from being awarded prejudgment interest. The statute says, "Except for an action brought pursuant to chapter 668, when the judgment is for the recovery of money, interest from the time of the verdict or report until judgment is finally entered shall be added to the costs of the party entitled to the costs." Iowa Code § 625.21.

The district court relied on section 625.21 in denying prejudgment interest without distinguishing between an interest award dating from a verdict and an interest award dating from filing a lawsuit. Section 625.21 allows for an award of interest from the time of the verdict—not waiting until the entry of the judgment— for cases not brought pursuant to chapter 668. Here, it is undisputed the Shcharanskys did not bring their suit under the comparative fault act of chapter 668. *See Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 113 (Iowa 2011) (noting the legislature created the comparative fault act of Iowa Code chapter 668 in 1994 and "[b]y its terms, the purposes of the comparative fault act is to establish 'comparative fault as the basis for liability in relation to claims for damages arising from injury to or death of a person or harm to property'" (alteration in original) (citation omitted)). If anything, this statute supported the entry of interest from the date of the verdict in November 2018, rather than the April 2019 date when the court entered judgment—which the district court did not do. Additionally, section

625.21 does not control the request for interest from the date of the commencement of an action.

The Shcharanskys offer two "pathways" to an award of prejudgment interest from the commencement of their action. First, they argue section 668.13(1) allows for it. That section provides, "Interest shall be allowed on all money due on judgments and decrees on actions brought pursuant to this chapter, subject to the following: 1. Interest . . . shall accrue from the date of the commencement of the action." Iowa Code § 668.13(1). But as we stated, it is undisputed the Shcharanskys did not bring their contribution claim pursuant to the chapter 668 comparative fault act. And, on its face, the section is limited to "actions brought pursuant to this chapter." *See id.* *Baumler v. Hemesath*, 534 N.W.2d 650, 655–56) (Iowa 1995), supports this understanding; in it, our supreme court rejected the party's claim that interest should be governed by section 668.13 rather than chapter 535, noting the case was not tried pursuant to chapter 668 and therefore those interest provisions did not govern apply. This pathway fails.

Second, the Shcharanskys argue section 535.2(1)(b) allows them to receive prejudgment interest. It provides, "[T]he rate of interest shall be five cents on the hundred by the year in the following cases . . . . Money after the same becomes due." Iowa Code § 535.2(1)(b). The Shcharanskys maintain this section arguably allows them to receive interest from the date they discharged the Wells Fargo debt in 2010 but, as they did at the district court, they ask that we award interest from the date they filed suit in January 2011.

"Generally, interest runs 'from the time money becomes due and payable and, in the case of unliquidated claims, from the date they become liquidated.'"

*Hughes v. Burlington N. R.R. Co.*, 545 N.W.2d 318, 321 (Iowa 1996) (citation omitted). "Unliquidated damages normally become liquidated on the date of the judgment." *Id.* "Iowa courts, however, have recognized an exception to the unliquidated claims rule when the damage is complete at a specified time." *Brenton Nat'l Bank v. Ross*, 492 N.W.2d 441, 443 (Iowa Ct. App. 1992). "In such a situation, interest runs from the time the damage is complete even though the damage has not been fixed in a specific sum." *Id.*

Here, the damage was complete at the time Alexander and Tatiana discharged the Wells Fargo debt. Therefore, the district court erred in denying their request for interest from the day they filed their contribution claim. We reverse the district court's ruling on prejudgment interest and remand for the court to correct the entry of judgment.

**IV. Conclusion.**

We affirm the district court ruling as to all the issues raised by the Shapiro Group on appeal. However, on cross-appeal, we reverse the district court's ruling as to Alexander and Tatiana Shcharansky's request for interest from the day they filed their contribution claim. We remand for the limited purpose of correction of the judgment order.

**AFFIRMED ON APPEAL; REVERSED AND REMANDED WITH DIRECTIONS ON CROSS-APPEAL.**