# IN THE COURT OF APPEALS OF IOWA

No. 19-0847
Filed November 4, 2020

**KATHLEEN BROWNELL,**
Plaintiff-Appellee,

**vs.**

**SCOTT M. JOHNSON,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Palo Alto County, Nancy L. Whittenburg, Judge.

The defendant appeals from the judgment entered against him after a jury found he intentionally interfered with a contract involving his former stepmother and her alimony payments. **REVERSED AND REMANDED.**

William T. Talbot of Newbrough Law Firm, LLP, Ames, for appellants.

Jeremy L. Thompson of Putnam & Thompson Law Office, P.L.L.C., Decorah, for appellee.

Gary J. Streit of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for amicus curiae Iowa Academy of Trust and Estate Counsel.

Considered by Doyle, P.J., and Mullins and Greer, JJ.

**GREER, Judge.**

Kathleen Brownell sued Scott Johnson, her former stepson, claiming he intentionally interfered with a contract. More specifically, she alleged Scott interfered with the decree[1] dissolving her marriage to Scott's father, Phillip Johnson, which awarded Kathleen $1600 in alimony each month.[2] The jury found in Kathleen's favor and awarded her $59,800. Scott appeals that judgment. He maintains the court should have entered judgment for him—either by granting his motion for directed verdict or granting his motion for judgment notwithstanding the verdict—because the court could conclude as a matter of law that his conduct was not improper given his role as trustee or as agent under power of attorney. In the alternative, Scott argues the trial court should have granted his motion for new trial because there was "sufficient irregularity" in the proceedings to warrant a new trial.

The Iowa Academy of Trust and Estate Counsel sought leave to file an amicus brief, which our supreme court granted before transferring the case to us. The amicus's stated purpose in filing an appellate brief is to "assure that [our]

---

[1] "[A] stipulation of settlement in a dissolution proceeding is a contract between the parties, [and] it becomes a final contract when it is accepted and approved by the court." *In re Marriage of Lawson*, 409 N.W.2d 181, 182 (Iowa 1987). But once the court enters a decree, the stipulation, as a practical matter, has no further effect. *See Bowman v. Bennett*, 250 N.W.2d 47, 50 (Iowa 1977). The decree, not the stipulation, determines what rights the parties have. *Id.; In re Marriage of Von Glan*, 525 N.W.2d 427, 430 (Iowa Ct. App. 1994). Therefore, in ascertaining the rights of the parties after final judgment, it is the intent of the district court that is relevant, not the intent of the parties. *In re Marriage of Knott*, 331 N.W.2d 135, 137 (Iowa 1983). So, the decree, not the stipulation, is the enforceable instrument. Here, the parties stipulated that a contract—the agreement to pay alimony—met the first element of an interference with a contract claim, and so we do not address the issue of whether a stipulation incorporated by a decree satisfies the element outside of the facts if this case.

[2] Kathleen also sued the Johnson Farm Account Trust, but in this appeal, Scott Johnson is the only defendant-appellant.

disposition of the appeal does not result in the adoption of a standard that the trustee of a trust owes any duty to the creditor of a beneficiary of a trust when the trustee is making distributions to other beneficiaries of the trust in compliance with terms of the trust."

Kathleen asks that we affirm the judgment against Scott and award her appellate attorney fees.

**I. Background Facts and Proceedings.**

Kathleen and Phillip married in 1994. They have no shared biological children; each had children from previous marriages.

During their marriage, Phillip was diagnosed with cognitive impairment, which Phillip and his family understood to mean that at some point he was likely to have dementia or Alzheimer's disease. Phillip understood that he had to have personal assets of no more than $2000 and monthly income below a threshold to qualify for Medicaid nursing home coverage. With this in mind and to qualify in the future, Phillip executed the Johnson Farm Account Trust on June 25, 2012. Kathleen understood the plan given Phillip's likely future. So they conveyed all of his assets to the trust, including all of the farmland he owned.[3] Phillip was the initial trustee, and Scott was the successor trustee. Scott and his two brothers were the beneficiaries for the trust, but while Phillip remained trustee, he did "not owe any fiduciary duty or similar obligation to the remainder beneficiaries of the trust."

---

[3] Kathleen signed deeds transferring the land to the trust.

In July 2012, Kathleen filed for dissolution, and Phillip and Kathleen's marriage was dissolved in May 2013 under a stipulated decree. Both parties were represented by attorneys. As part of the stipulation, Kathleen "surrender[ed] and disclaim[ed] any and all interest" she may have had in Phillip's real estate and in the Johnson Family Account Trust. And Phillip agreed to pay Kathleen $1600 in alimony each month until one of them died or until Kathleen remarried. He also agreed to make a cash payment to Kathleen for $30,000 and to assign her his life insurance policy worth $125,000, except the first $10,000 was to go to his estate. Kathleen had the responsibility of making the payments on the life insurance policy going forward.

Phillip made the monthly alimony payments to Kathleen until he suffered a farm injury in July 2015. The injury coincided with Phillip's mental decline, and he transitioned to a nursing home that same month. He continued to live there at the time of the underlying trial in January 2019. Phillip was at first not eligible for nursing home compensation through Medicaid because the Johnson Farm Account Trust had been set up within five years. Phillip became eligible in July 2017—when the five-year lookback period expired.

Scott began managing Phillip's affairs as his agent under power of attorney in July 2015. Initially, he made Phillip's alimony payments to Kathleen, using the Phillip K. Johnson Farm Account.

In March 2016, Scott—on behalf of Phillip—petitioned to have Phillip's alimony obligation terminated or modified. After filing the petition, Scott made only one more alimony payment to Kathleen—in April 2016. He made no partial payments or attempted payments after that date. Kathleen made no efforts to

collect the past due alimony other than calling Scott on the phone and sending Scott some personal letters.

More than a year later, in July 2017, Kathleen sued Scott and the trust, alleging one theory: intentional interference with a contract in failing to make Phillip's alimony payments to her.

In September 2017, at the advice of attorneys, Scott signed the document acknowledging him as trustee of the Johnson Farm Account Trust. He also created the Johnson Farm Account Trust checking account "[t]o keep money out of [Phillip's] personal account so [Phillip] would qualify for Title XIX."

In April 2018, the district court entered a modified decree, reducing Kathleen's alimony to $600 per month and making the ruling retroactively effective to April 2016.

In June 2018, as trustee, Scott transferred all of the property from the trust to him and his brothers. He also closed the trust checking account and disbursed the funds between him and his brothers.

The jury trial on Kathleen's petition for intentional interference with a contract began in January 2019. The parties stipulated that she was owed $25,200 in alimony as of the trial. Kathleen testified that she borrowed $2500 from a daughter, $4500 from another daughter, and $7698 from her son to live on while she was not receiving her alimony payments. She also testified she incurred about $19,000 in attorney fees and had taken $15,000 in cash value from the life

insurance policy to keep the payments up to date on that policy. Kathleen asked for $74,000 in damages.[4]

During his testimony, Scott was asked why he stopped making alimony payments to Kathleen. Scott testified, "[I]t just cost a lot of money to keep [Phillip] in the care center." Before Phillip qualified for Medicaid nursing home coverage, he was billed about $5500 each month to live in the nursing home. Since Phillip qualified for Medicaid coverage in July 2017, Phillip's personal bill for the nursing home is about $1325 each month. Phillip receives about $1675 from Social Security monthly. The money from Social Security counts toward the income threshold Phillip must stay below to qualify for nursing home coverage through Medicaid. According to Scott, other than his alimony obligation, his father's only other personal expenses are "clothes, haircuts and that kind of thing."

Through Scott's testimony, Kathleen introduced into evidence the bank statements of "Phillip K Johnson Farm Account" checking for January 2015 through December 2018.[5] This checking account pre-existed the trust account but became property of the trust once Phillip executed the trust documents. However, it was not used to hold only funds of the trust. Phillip had personal funds in the account as well; his personal Social Security checks were deposited in this account along with the income Phillip received from the trust for farm rents. Both before

---

[4] Kathleen initially asked for punitive damages as well, but she abandoned that claim during trial.

[5] The "Farm Account" portion of the title seems to have been removed in December 2017—shortly after Scott opened the Johnson Farm Account Trust checking account. The bank account is the "Phillip K Johnson" checking account on the statements from December 2017 until December 2018, but it appears to be the same account. We refer to this account as the "Phillip K Johnson Farm Account" throughout to avoid confusion.

and after Phillip's accident, this is the account used to make Brownell's alimony payments—whether by Phillip or Scott.

During his testimony, Scott agreed that he knew of the dissolution decree and that it required his father to pay Kathleen $1600 in alimony monthly (until the district court modified the obligation). He testified that "[b]efore [his] dad went on Title XIX, there wasn't enough money to go round to pay all of his bills" and agreed he made a conscious decision to prioritize "other bills . . . versus paying" Kathleen alimony. He also agreed that even after Phillip qualified for nursing home coverage through Medicaid and Kathleen's alimony was reduced to $600 each month, he had not "made any effort or attempt to make payment to" Kathleen. When asked, Scott testified he did not like Phillip's alimony obligation and did not think it was "fair." Kathleen wrote a few notes to Scott inquiring about the delinquent payments but never resorted to legal avenues of collection until this lawsuit was commenced.

At the close of evidence, Scott moved for a directed verdict. He conceded that he was aware of the alimony obligation and intentionally stopped making payments to Kathleen, but he maintained that as a matter of law his conduct was not improper given his legal obligations to Phillip. The court denied Scott's motion.

On the verdict form, the jury circled "yes" that it found against the trust but wrote "0" for the amount of recovery. They jury also found for Kathleen against Scott and first awarded "$40,800 plus court and attorney fees/costs" to her. The court asked the jury, "Do you mean—what do you mean by attorney fees? You wanted to include the $19,000 number?"[6] The foreperson responded, "We

---

[6] The district court also answered a jury question about the amount of attorney fees in the case by providing the "testimony" of $19,000. Rather than responding

weren't—They said that that was kind of an estimate. So we just said whatever attorney fees were incurred." The court told the jury, "So it is the court's duty to tax the costs in this matter. But the amount—you have to determine the amount of attorney fees and tax them as part of—and include them in part—as part of the judgment you have entered." The court then gave the verdict form back to the jury and sent it back to determine the amount of attorney fees it wanted to award. When the jury returned and handed the verdict form back in, it had crossed out its previously written judgment and wrote in "$59,800.00" with the foreperson's initials next to the new amount.

Scott filed a motion for judgment notwithstanding the verdict or a new trial, which the district court denied in its entirety.

Scott Johnson appeals.

**II. Discussion.**

**A. Motion for Directed Verdict and Motion for Judgment Notwithstanding the Verdict**

Kathleen sued Scott for intentional interference with a contract. To succeed on this claim, the jury instructions stated she had the burden to prove:

> 1. [Kathleen] had a contract with Phillip Johnson.
> 2. [Scott] knew of the contract.
> 3. [Scott] intentionally and improperly interfered with the contract by not making monthly spousal support payments to [Kathleen].
> 4. The interference caused Phillip Johnson not to perform the contract.
> 5. The nature and amount of damage.

---

with the court's memory of the evidence, a jury should be told to use their collective knowledge to answer the inquiry. The fear is that juries would tend to accept a court's note as conclusive evidence.

Most of the elements were not disputed at trial. Scott admitted that Kathleen and Phillip had a contract; that he was aware of the contract; and that he intentionally stopped making any alimony payments to Kathleen, which caused Phillip to breach the contract and caused at least some damages to Kathleen.

Yet, Scott maintains the court should have granted either his motion for directed verdict or his motion for judgment notwithstanding the verdict because the court should have found, as a matter of law, that his actions were not improper. "On appeal, an appellate court's review is limited to those grounds raised in the defendant's motion for a directed verdict." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 844 (Iowa 2010). "Error must be raised with some specificity in a directed verdict motion," and "[a] motion for judgment notwithstanding verdict must stand on the grounds raised in the directed verdict motion." *Id.* at 845. We review the district court's rulings for correction of errors at law. *Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 106 (Iowa 1995). The question is whether there was sufficient evidence to submit the case to the jury, and in reviewing the district court's decision, we view the evidence in the light most favorable to Kathleen. *See id.*

At the onset of our analysis, we do not address any claim against the trust itself because that jury verdict has not been appealed.[7] Although the jury found it

---

[7] In her brief, Kathleen argues Phillip assigned his alimony obligation to the trust under a ratification of contract theory. That issue was not presented to the jury to make findings or made a theory of the case with any jury instruction, so we do not consider it now for the first time on appeal. *See Fed. Land Bank of Omaha v. Recker*, 460 N.W.2d 480, 482 (Iowa Ct. App. 1990) ("It is axiomatic that we will generally not consider issues raised for the first time on appeal.").

also interfered with the alimony contract, no damages were awarded against the trust. Kathleen filed no motions related to this potential inconsistency in the verdict.

Related to the issues in her brief, Kathleen moves between her arguments focused on Scott as a trustee and Scott as Phillip's agent under the power of attorney—often confusing those roles and Scott's actions.[8] Yet, in his role as either a trustee or an agent, Scott was targeted as the third party interfering with the contract to pay alimony. Scott operated as Phillip's agent starting in July 2015. He did not assume the role of successor trustee of the trust until September 2017. Scott's arguments are all focused on whether his actions as trustee, agent, or both were improper. To clarify the issues, we address each role separately to determine if his actions in either capacity were improper.

*1. Role as a trustee.*[9]

To begin, the trust and trustee owed no duty to Kathleen as a creditor of a trust beneficiary. "Persons who may incidentally benefit in some manner from the performance of the trust are not beneficiaries of the trust and cannot enforce it." Restatement (Third) of Trusts § 48 cmt. a (Am. Law. Inst. Oct. 2020 Update). The Iowa Academy of Trust and Estate Counsel raised this concern. And the amicus implores us to find that Scott had no duty to Phillip's creditors when he, acting in

---

[8] As an example, Kathleen disputes the amicus position by noting that Scott "unilaterally terminated the trust, and disbursed trust property and cash to he and his brothers" but then concluded that "[i]t can reasonably be found that [Scott] conducted himself improperly in his capacity as [an agent], and not as a Trustee."

[9] "A trustee shall administer the trust with the reasonable care, skill, and caution as a prudent person would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust." Iowa Code § 633A.4203 (2017).

his capacity as trustee in compliance with the terms of the trust, decided what distributions to make and to whom. The undisputed duty of loyalty of a trustee is to the beneficiaries of the trust, not the creditor of any beneficiary. Restatement (Third) of Trusts § 78(1).

First, both Kathleen and Scott confirmed that the trust purpose was two-fold. One purpose was to qualify Phillip for Medicaid benefits, which required Phillip to maintain a limited net worth of $2000 and a limited monthly income. The second purpose was to ensure that Phillip's sons retained the family real estate. To effectuate this purpose, Kathleen admits in her brief that after all real estate was transferred to the trust she "disclaimed and surrendered any and all interest she may have in the Trust." Also with those goals in mind, Scott maintains he fulfilled his obligations as trustee in the manner he was supposed to; he stopped making income distributions to Phillip so that his father could remain eligible for Medicaid nursing home coverage. Then after the qualification for Medicaid, he transferred the trust assets to the beneficiaries to preserve their interests in the family real estate. Scott notes that he relied on the advice of several attorneys in taking these actions. At trial, Scott observed:

> Q. Okay. In terms of the actual interference with the contract, you would agree with me that it's been your decision not to make payments? A. Right.
> Q. And you're—is it fair to say you kind of had a thought process as to why payments haven't been made? A. Yes. Before my dad went on Title XIX, there wasn't enough money to go around to pay all of his bills.
> Q. So you made a conscious decision to prioritize other bills, such as nursing home or medical expenses, versus paying Kathleen? A. Right.
> . . . .
> Q. I'm going to ask you, if you would, please, Scott, to read the entire first sentence of Section 8 [of the trust]. A. "One of my

estate planning goals is to protect the interests of the beneficiaries of this trust from loss or diminution on account of divorce, financial irresponsibility or immaturity, substance abuse, lawsuits, judgments, personal bankruptcy, and other legal process or the claims and demands of real . . . putative creditors, including claims for alimony, maintenance, child support, property division in divorce, et cetera."

Q. Is it your understanding from that sentence that you're supposed to protect the trust assets from any judgment creditor? A. Yes.

Q. Is it your understanding that you're supposed to protect the assets of the trust from alimony claims? A. Yes.

We agree that Scott, acting as the trustee, had to make decisions that were best for the beneficiaries without concerning himself whether those actions interfered with Phillip's ability to make his alimony payments. *See, e.g.*, Restatement (Third) of Trusts § 78(1) ("Except as otherwise provided in the terms of the trust, a trustee has a duty to administer the trust *solely in the interest of the beneficiaries*, or solely in furtherance of its charitable purpose." (emphasis added)); *id.* § 78 cmt. f ("*Actions serving the interests of third persons or non-trust objectives.* In administering a trust, the trustee has a duty to the beneficiaries not to be influenced by the interest of any third person or by motives other than the accomplishment of the purposes of the trust."). Further even Kathleen testified:

Q. The purpose of the Johnson Farm Account Trust, I believe that we agreed earlier, was twofold. And we agreed—tell me if I'm correct or not—that the first purpose was to qualify for Medicaid— A. Uh-huh (yes).
Q. —is that correct? A. Correct.
Q. Second purpose was to pass the real estate to his sons; is that correct? A. Correct.
Q. And Scott has done that perfectly, hasn't he? A. I probably wouldn't say perfectly, but he's done what he's needed to do.
Q. Would you agree with me that, if Scott violated the trust and harmed his brothers, that he would be liable to them? A. I would agree to that.
Q. Do we agree then that Scott has a duty as trustee not to harm the beneficiaries? A. Agree.

Kathleen acknowledged the trust goals that Scott followed. But at trial and in her brief, she argues in his role as trustee, his failure to pay her interfered with her contract between herself and Phillip. But Kathleen is not a creditor of the trust. Even the jury found the trust owed her nothing. Thus, Scott, operating as trustee, owed Kathleen no fiduciary duty. *See* Iowa Code §633A.4202(1) ("A trustee shall administer the trust solely in the interests of the beneficiaries, and shall act with due regard to their respective interests.").

Because, as it relates to Kathleen's claim for alimony, Scott performed the duties of trustee according to the directives of the trust instrument, we find he cannot be held liable under the interference-with-a-contract theory in his role as trustee as a matter of law. "[C]onduct is generally not improper if it was merely a consequence of actions taken for a purpose other than to interfere with a contract." *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 244 (Iowa 2006). "[A] party does not improperly interfere with another's contract by exercising its own legal rights in protection of its own financial interests." *Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996). The district court erred by denying the motion for directed verdict as to Scott's trustee role in the intentional-interference-with-contract claim.

Next we look to Scott's behavior as Phillip's agent.

*2. Role as agent under power of attorney.*[10]

Starting from Phillip's accident in July 2015, Scott operated as Phillip's agent under the power of attorney. Kathleen maintains that in that role, he

---

[10] Power-of-attorney duties are defined under Iowa Code section 633B.114. *See also* Iowa Code § 633B.201(7) ("An act performed by an agent pursuant to a power

interfered with her contract for alimony by refusing to pay her. Once Scott took over Phillip's finances, no further alimony payments occurred after April 2016. Kathleen highlights that when Phillip controlled his finances, he never missed an alimony payment. But during that time frame Phillip's expenses did not include nursing-home care and significant medical bills. So with the focus on whether his failure to pay Phillip's alimony debt was improper, we examine Scott's role as Phillip's fiduciary. As agent, Scott, was required to act in *Phillip's* best interests. *See In re Estate of Crabtree*, 550 N.W.2d 168, 171 (Iowa 1996) (finding decision by agent that considered the financial interest of the ward over the financial interest of the ward's daughter was appropriate). Essentially the agent acting under a power of attorney steps into the shoes of the principal to act for the best interests of the principal. *See* Iowa Code § 633B.114. In that role as agent, disrupting the alimony contract between Phillip and Kathleen arguably did not involve Scott as a third party because he acted in a role as if he were Phillip. But the issue framed on appeal was whether Scott's conduct as agent was wrongful. Kathleen argues the wrongful conduct occurred when Scott failed to act in Phillip's best interest and acted contrary to his father's expectations by refusing to pay her alimony. Scott argues, as agent, his role required him to preserve monies for Phillip's needs first and follow his father's estate plan. *See id.* § 633B.114(2)(a), (f)(2).[11]

---

of attorney has the same effect and inures to the benefit of and binds the principal and the principal's successors in interest as if the principal had performed the act.").

[11] Scott asserted he paid the farm mortgage, nursing home expense, and medical expenses over Kathleen's alimony payment and borrowed $70,000 against the trust assets to meet those obligations.

What we glean from Kathleen's brief and arguments are various actions by Scott as trustee and as agent that she labeled "improper conduct." But, drilling down to the specific improper conduct of Scott as agent, Kathleen argues Scott "felt entitled to pick and choose which bills ultimately got paid." It then follows, under Kathleen's theme, Scott was not acting on behalf of or in Phillip's best interest. And Kathleen emphasizes that Scott testified he did not like that his father was ordered to pay alimony because he thought it was unfair. So does refusing to pay the principal's creditor amount to improper conduct by the agent under an interference-of-contract claim?

If we step back from this case, we would plow new ground to hold that an agent acting under a power of attorney must pay all bills of the principal or risk a claim of interference with a contract by a creditor. An agent, acting for the principal, might decide to prioritize which bills to pay, and if a creditor finds the action wrongful, the remedy is breach of contract. The motives of Scott in preserving assets for his father's care and upholding the estate plan, which all parties acknowledged in this case, is not improper under his role as agent. Scott exercised financial discretion to protect his father's legal rights, and Kathleen failed to prove his sole motivation was to defeat the alimony contract. *See Hackett v. Gaeta*, No. 12-2302, 2013 WL 4011440, at *2-3 (Iowa Ct. App. Aug. 7, 2013) (holding motion for directed verdict proper in intentional-interference-with-contract claim where the defendant's sole motivation was not to inhibit farm sale to buyers but to assert his position he had a legal right to the farm). Thus, the record does not support a finding of wrongful conduct against Scott as an agent for Phillip. *See Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 663–64 (Iowa 2008) (describing

wrongful conduct as conduct that is "dishonest, fraudulent, malicious, or otherwise wrongful")

Here, as Scott argues, Kathleen's claim boils down to a breach-of-contract claim against Phillip. *See Klooster v. N. Iowa State Bank*, 404 N.W.2d 564, 570 (Iowa 1987) (noting that where the interference alleged involved performance of a contract between the parties, the plaintiff had an adequate remedy for breach of contract). Kathleen's interference claim sought to end run around the position she placed herself in when she agreed to the trust plan Phillip proposed. The contract between Phillip and Kathleen remains viable. Kathleen's contractual rights against Phillip still exist. It is the full collection of those contract rights that remain challenging but not impossible.

Again, we find that the district court erred by denying the motion for directed verdict as to Scott's power-of-attorney role in the intentional-interference-with-contract claim. Thus, Kathleen had no basis for an intentional-interference-with-a-contract claim.

*3. Amicus position.*

Last, we address the concerns of the Iowa Academy of Trust and Estate Counsel. Nothing in this ruling should translate into a duty on trustees to consider the interests of third-party creditors over the interests of the trust beneficiaries. As noted above, the issues in this case involve the creditor/debtor tensions between divorced parties. In the end, we narrow this case to a creditor/debtor dispute at its core. Kathleen still maintains an enforceable judgment against Phillip for alimony. That "contract" still exists. As Kathleen confirmed in her brief, she "agreed that all real property in Pocahontas and Palo Alto counties would remain with [Phillip] and

further that she disclaimed any and all interest she may have in the Trust." The collection of those sums due for alimony is her central issue, but she bears some of the responsibility for the difficulty in collection given her choices during the divorce proceedings and after.

**B. Appellate Attorney Fees.**

As a part of her appeal, Kathleen asks that we award her appellate attorney fees; she cites Iowa Rule of Appellate Procedure 6.1207 in support of this request and asks that we remand for separate hearing for appellate attorney fees to be determined.

Rule 6.1207 provides, "All appellate fees and costs shall be taxed to the unsuccessful party, unless otherwise ordered by the appropriate appellate court." But "[a]ppellate costs do not include appellate attorney fees." *In re Marriage of Hoffman*, 891 N.W.2d 849, 852 (Iowa Ct. App. 2016) (considering rule 6.1207). And there is no written contract here that allows for the recovery of fees. *See* Iowa Code § 625.22 (2017) ("When judgment is recovered upon a written contract containing an agreement to pay an attorney fee, the court shall allow and tax as a part of the costs a reasonable attorney fee to be determined by the court"). So we have no authority to award appellate attorney fees here. *See W.P. Barber Lumber Co. v. Celania*, 674 N.W.2d 62, 66 (Iowa 2003) ("As a general rule, an award of attorney fees is not allowed unless authorized by statute or contract."). Additionally, because Kathleen is not the successful party, on that basis, she is not entitled to fees.

**III. Conclusion.**

The district court should have granted Scott's motion for directed verdict regarding Kathleen's claim. The law does not support the jury verdict, so it is improper and the verdict should be vacated. Finally, Kathleen is not entitled to appellate attorney fees in this case. We reverse and remand for the district court to enter an order vacating the judgment and dismissing Kathleen's petition with prejudice and assess costs to the Kathleen.

**REVERSED AND REMANDED.**

Doyle, P.J., concurs; Mullins, J., concurs specially.

**MULLINS, Judge** (concurring specially).

I concur in the result of the majority opinion. It addresses the claims and defenses asserted by the parties in the trial of the case, preserved for appellate review and properly raised on appeal. The limitations of our role in an appellate review—to consider only the issues raised—poses a potential problem here in that the majority opinion may be interpreted by some readers to recognize a cause of action even though the opinion really only addresses the issues based on how the case was presented to us. Consequently, I respectfully write separately to call into question the viability of Kathleen's theory of the case.

In this case, the petition sought damages claiming: "[T]he Defendants have intentionally and improperly interfered with a contract between the Plaintiff, Kathleen Brownell, and . . . Phillip Johnson; namely the Decree of Dissolution of Marriage and Stipulation and Agreement filed on May 29, 2013" in the dissolution-of-marriage case involving Kathleen Johnson and Phillip Johnson. The decree of dissolution of marriage "ordered that the stipulation and agreement of the parties is approved and is by this reference incorporated herein and made the order and decree of this court."

When a contract is approved and incorporated into a decree of dissolution of marriage, can a claim of interference with the contract be actionable? Or, are the only remedies those that are available for enforcement of judgments?

Our supreme court has explained:

In accord with request made by the parties thereto an executed copy of the stipulation was attached to and by reference made a part of the decree as though set forth therein verbatim. Thus the stipulation became a part of the official record. This means, absent any expression in the stipulation to the contrary, it merged in and

constituted an operable part of the decree, even though embodied therein by reference.

> *Consequently, the stipulation was superseded by the decree. Thus attendant rights or obligations were those imposed by the decree, not the stipulation, and enforceable as such.*

*Bowman v. Bennett*, 250 N.W.2d 47, 50 (Iowa 1977) (citations omitted) (emphasis added).

Twenty-five years later, the supreme court restated and elaborated on the same conclusion:

> Because there appears to be some confusion with respect to the effect of the parties' stipulation in this case, we briefly discuss the role of a stipulation in a dissolution proceeding. A stipulation and settlement in a dissolution proceeding is a contract between the parties. Therefore, it is enforceable like any other contract, and a party may not withdraw or repudiate the stipulation prior to entry of judgment by the court.
>
> Nonetheless, the parties' stipulation is not binding on the court, as the court has the responsibility to determine whether the provisions upon which the parties have agreed constitute an appropriate and legally approved method of disposing of the contested issues. Accordingly, if the stipulation is unfair or contrary to law, the court has the authority to reject the stipulation. . . .
>
> *In fact, once the court enters a decree, the stipulation, as a practical matter, has no further effect. The decree, not the stipulation, determines what rights the parties have.* Therefore, in ascertaining the rights of the parties after final judgment, it is the intent of the district court that is relevant, not the intent of the parties.

*In re Marriage of Jones*, 653 N.W.2d 589, 593–94 (Iowa 2002) (emphasis added) (citations and internal quotations marks omitted). This has long been the law in Iowa. *See, e.g.*, *Belding v. Huttenlocher*, 159 N.W. 191, 194 (Iowa 1916) ("[W]hatever stipulation was made between the parties prior to the entering of the decree was merged in the decree and deed subsequently executed. No rights can be acquired by either as against the other, based upon the stipulation. . . . The rights thereafter rested upon the decree and the deeds, and not upon the

stipulation, which, as said before, became merged in these subsequent proceedings.").

Based on the foregoing, it is the decree that determines what the rights of the parties are, not the stipulation and agreement or any purported contract rights. Iowa has not recognized the tort of interference with contract rights arising out of a settlement agreement that has been approved and incorporated into a decree dissolving a marriage, and we do not do so in the majority opinion.

Under current case law, Kathleen's rights to enforcement of the terms of the agreement that were approved by the court and incorporated into the decree arose from the judgment as decreed, and only from that judgment, once the agreement was approved and incorporated into the decree.